**AMERICAN INTERNATIONAL GROUP, INC., et al.**

v.

**ISLAMIC REPUBLIC OF IRAN, et al., Appellants,**

United States, Intervenor.

**PFIZER INC., et al.**

v.

**ISLAMIC REPUBLIC OF IRAN, The Ministry of Health and Welfare of the Islamic Republic of Iran, and The Ministry of Industries and Mines of the Islamic Republic of Iran, Appellants,**

Bank Markazi Iran, et al.

United States, Intervenor.

Nos. 80–1779, 80–1891 and 80–2541 to 80–2543.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1981.

Decided May 22, 1981.

Opinion June 5, 1981.

Michael F. Hertz, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., Robert E. Kopp and John F. Cordes, Attys., Dept. of Justice, Washington, D. C., were on the brief, for United States, intervenor in Nos. 80–1779, 80–1891, 80–2541, 80–2542 and 80–2543. Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U. S. Attys., and J. Christopher Kohn, Atty., Dept. of Justice, Washington, D. C., also entered appearances for United States.

Thomas G. Shack, Jr., Washington, D. C., with whom Christine Cook Nettesheim, Thomas D. Silverstein, John D. Aldock and John Townsend Rich, Washington, D. C., were on the brief, for Islamic Republic of Iran, et al., appellants in Nos. 80–1779, 80–1891 and 80–2541.

Eric M. Lieberman, New York City, with whom Leonard B. Boudin, New York City, and Allan S. Hoffman, Washington, D. C., were on the brief, for Bank Markazi Iran, appellants in No. 80–2542. Robert A. Seefried, Washington, D. C., also entered an appearance for Bank Markazi Iran.

Daniel P. Levitt, New York City, with whom Allan S. Hoffman, Washington, D. C., was on the brief for Iranians Bank, appellant in No. 80–2543.

Monroe Leigh, Washington, D. C., with whom Daniel J. Plaine and Alice L. Mattice, Washington, D. C., were on the brief, for Pfizer, Inc., et al., appellees in Nos. 80–2541, 80–2542 and 80–2543. Valerie A. Slater, Washington, D. C., also entered an appearance for Pfizer, Inc., et al.

Walter D. Vinyard, Jr., Washington, D. C., with whom Michael K. Madden and Sidney O. Smith, Washington, D. C., were on the brief, for Continental Corp., appellee in Nos. 80–1779 and 80–1891.

David R. Hyde, New York City, with whom Donald J. Mulvihill, Washington, D. C., was on the brief for American International Group, Inc., et al., appellees in Nos. 80–1779 and 80–1891.

Joseph A. Artabane, Washington, D. C., also entered an appearance for INA Corp., appellee in Nos. 80–1779 and 80–1891.

Stephen M. Truitt, Washington, D. C., was on the brief for TCSB, Inc., et al., amici curiae urging the availability of a remedy against the United States in Nos. 80–1779 and 80–1891.

Alan Raywid and Margaret E. Rolnick, Washington, D. C., were on the brief for Sperry Corp., et al., amici curiae in support of Pfizer, Inc., in Nos. 80–1779, 80–1891, 80–2541, 80–2542 and 80–2543.

David Ginsburg, Lee R. Marks and Alan S. Weitz, Washington, D. C., were on the brief, for American Bell International, Inc., amicus curiae in Nos. 80–1779, 80–1891, 80–2541, 80–2542 and 80–2543, urging that this Court reserve decision with respect to claimants lacking an arbitral remedy.

William R. Hyde, Jr., Washington, D. C., was on the brief for Touche Ross and Co., et al., amici curiae in Nos. 80–1779, 80–1891, 80–2541, 80–2542 and 80–2543, urging that this Court reserve decision with respect to claimants lacking an arbitral remedy.

Sherman E. Katz, Washington, D. C., was on the brief for Sylvania Technical Systems, Inc., amicus curiae in Nos. 80–1779, 80–1891, 80–2541, 80–2542 and 80–2543, urging that certain claimants may be entitled to just compensation as a matter of equal protection.

Before McGOWAN and MIKVA, Circuit Judges, and JAMESON,* Senior District Judge for the District of Montana.

Opinion for the Court filed by Circuit Judge McGOWAN.

Separate Statement filed by Circuit Judge McGOWAN, in which Senior District Judge JAMESON concurs.

Separate Statement filed by Circuit Judge MIKVA.

McGOWAN, Circuit Judge:

While these cases were before this Court on interlocutory appeal, the United States and Iran on January 19, 1981 settled by executive agreement the crisis stemming from the seizure of the American Embassy in Iran and the holding of American diplomatic personnel as hostages. To fulfill its obligations under the two agreements, the United States filed a Statement of Interest with this Court on February 26, 1981, asking that the existing attachments and other restraints upon Iranian assets be vacated, and that the underlying private claims for judicial relief be suspended. On May 22, 1981, this Court issued a judgment granting those two requests, but denying the later request of the United States to set aside the partial summary judgments in Nos. 80–1779 and 80–1891. In this opinion we explain the reasons for our actions.

## I

The events following the seizure of the American Embassy in Teheran on November 4, 1979, are too familiar to require any extended recounting here. It will suffice for the purposes of this case to note that the capture of the embassy and the taking of its personnel as hostages created a foreign policy crisis of the gravest proportions. While the Government of the United States moved on many fronts to secure the hostages' release, it is the legal measures taken by the President that chiefly concern us.

On November 15, 1979, President Carter, acting under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (Supp. II 1978), issued regulations that, *inter alia*, blocked the removal or the transfer of Iranian assets in the United States except according to the terms of licenses accompanying the blocking order or later issued pursuant to it. *See* 31 C.F.R. Part 535 (1980). Of especial importance to the instant case is 31 C.F.R. § 535.203(e) (1980), which states:

> Unless licensed or authorized pursuant to this part any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since the effective date there existed an interest of Iran.

Not long after that regulation became effective, the President, on November 26, 1979, did grant a general license authorizing certain judicial proceedings against Iran, with the exception of the "entry of any judgment or of any decree or order of similar or analogous effect. . . ." 31 C.F.R. § 535.504(a), (b)(1) (1980). On December 19, 1979, the President issued another regulation intended to clarify 31 C.F.R. § 535.504 (1980). It stated: "The general authorization for judicial proceedings contained in § 535.504(a) includes pre-judgment attachment." 31 C.F.R. § 535.418 (1980).

On November 19, 1979, before any of the general licenses authorizing judicial proceedings, including pre-judgment restraints against Iranian assets, had been issued, the President also issued a regulation stating: "The provisions of this part and any rulings, licenses, authorizations, instructions, orders, or forms issued thereunder may be amended, modified, or revoked at any time." 31 C.F.R. § 535.805 (1980). Thus, before any of the appellees in this case had filed suit against Iran or its instrumentalities or enterprises, they were on notice that the regulations providing access to judicial process, including provisional remedies, could be revoked at any time pursuant to IEEPA.

On December 7, 1979, appellees in Nos. 80–1789 and 80–1891, American International Group, Inc. (AIG), the Continental

* Sitting by designation pursuant to 28 U.S.C. § 294(c).

Corp., and others, filed suit against Iran and Central Insurance of Iran in the United States District Court for the District of Columbia. *See* Joint Appendix in Nos. 80–1789 and 80–1891 at 1–2 [hereafter referred to as AIG J.A.]. Plaintiffs asserted a $34 million claim for the nationalization of their Iranian ventures. AIG J.A. at 12–20. On that day, Judge Gesell entered a temporary restraining order against the defendants preventing them from removing or transferring any of their assets. AIG J.A. at 36–39. On December 19, Judge Hart, pursuant to an ex parte application of plaintiffs, attached a painting by Willem de Kooning entitled "Women Three" and five sculptures of Jean Dubuffet that were on loan to the National Gallery. AIG J.A. at 43. Later writs of attachment were also granted against other Iranian assets. *See* AIG J.A. at 5–7.

On July 10, Judge Hart issued two more orders. The first was a partial summary judgment in favor of plaintiff-appellees on the issue of liability. AIG J.A. at 394–401. The second was a preliminary injunction preventing Iran or Central Insurance of Iran from taking any action that would remove their assets from the jurisdiction of the court. AIG J.A. at 392. Finding that his order of partial summary judgment raised substantial and controlling questions of law, Judge Hart certified the action for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) (1976) on July 11. AIG J.A. at 403. Defendants filed a notice of appeal that same day. AIG J.A. at 402.

On October 30, 1980, Pfizer, Inc. and two subsidiaries filed suit against Iran, its Ministry of Health and Welfare, its Ministry of Industries and Mines, the Bank Markazi Iran, and the Iranians Bank, seeking $23 million as compensation for the nationalization of Pfizer's Iranian enterprises. Joint Appendix in Nos. 80–2541, 80–2542 and 80–2543 at 1–2, 12–20 [hereafter referred to as Pfizer J.A.]. Judge Gasch issued a preliminary injunction on November 26, 1980, similar to that issued by Judge Hart, that restrained defendants from transferring certain assets. Pfizer J.A. at 565–67. The United States urges that both preliminary

injunctions be regarded as the functional equivalents of attachments, and appellees make no argument for distinguishing the injunctions from attachments. Defendants, entitled to an interlocutory appeal of the injunction, 28 U.S.C. § 1292(a)(1) (1976), filed notices of appeal on December 18. Pfizer J.A. at 662–66.

These cases were pending in this Court when the United States and the Islamic Republic of Iran agreed on terms for the release of the hostages on January 19, 1981. The terms of the agreement are embodied in two declarations of the Government of Algeria, which had acted as mediator between the two countries. These documents, which, having never been submitted to the Senate for its advice and consent, must be regarded as executive agreements, set forth the disposition to be made of private claims against Iran and the obligations of both nations.

In the Declaration of the Government of the Democratic and Popular Republic of Algeria [hereafter referred to as Declaration I], the United States agreed to "restore the financial position of Iran, in so far as possible, to that which existed prior to November 14, 1979." The parties also declared that their purpose was to

terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration .... [T]he United States agrees to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran.., to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration.

Declaration I, General Principle B.

As part of that agreement the United States promised to transfer all Iranian assets in this country, including those restrained by writs of attachment and prelim-

inary injunctions, within six months of the agreement's effective date, or July 19, 1981. *Id.*, para. 6.

The details of the arbitration process are established by the Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran [hereafter referred to as Declaration II]. The agreement creates the Iran-United States Claim Tribunal, comprising at least nine members, one-third of whom will be selected by the United States, one-third by Iran, and the remainder to be chosen by the other members. Declaration II, Art. III, para. 1. The tribunal has exclusive jurisdiction over all claims against the government of Iran other than those relating to the seizure of the embassy and the capture of the hostages, Declaration I, para. 11, those arising from actions of Iranians not attributable to their government, *id.*,[1] and those arising from "binding" contracts specifying Iran as the forum for dispute resolution, Declaration II, Art. II, para. 1.[2]

The agreements include a number of provisions designed to make arbitration a meaningful remedy. The Tribunal is to conduct its proceedings in accordance with the arbitration rules of the United Nations Commission on International Trade Law (UNCITRAL), Declaration II, Art. III, para. 2, and to "decide all cases on the basis of respect for law, applying such choice of law rules and principles of commercial and international law as the Tribunal determines to be applicable...." Declaration II, Art. V. Any award the Tribunal renders "shall be enforceable ... in the courts of any nation in accordance with its laws." *Id.*, Art. IV, para. 3.

When the Iranian assets now restrained in the United States are released, Iran will deposit $1 billion in a security account in the Algerian Central Bank to be used in satisfying awards rendered against Iran by the Tribunal. Declaration I, para. 7. Whenever the balance in that account falls below $500 million, Iran will deposit fresh funds until a $500 million balance is again achieved. *Id.*

To implement these executive agreements, President Carter issued a series of executive orders on January 19, 1981. Executive Orders 12279, 12280, and 12281 explicitly revoked all licenses for attachments and other restraints granted by 31 C.F.R. § 535.504 (1980). 46 Fed.Reg. 7919–24 (Jan. 23, 1981). On February 24, 1981, President Reagan, stating that he was acting under, *inter alia*, the IEEPA, 22 U.S.C. § 1732 (1976), sometimes referred to as the Hostage Act of 1868, and his constitutional authority, issued Executive Order 12294, which suspended all claims that could be presented to the Claims Tribunal. 46 Fed. Reg. 14111 (Feb. 26, 1981). The order said that "During the period of this suspension, all such claims shall have no legal effect in any action now pending in any court of the United States, ..."

The order established three categories of claims. If a claim is submitted to the Tribunal, and the Tribunal determines it lacks jurisdiction over it, the suspension of that claim shall terminate. Executive Order 12294, sec. 3. If the Tribunal determines that the claimant is not entitled to recovery on the merits, the claim shall be deemed discharged. *Id.*, sec. 4. If the Tribunal issues an award in the claimant's favor, then the claim shall be deemed discharged only upon full payment. *Id.*

That same day, the United States filed a Statement of Interest with this Court seeking vacation of the attachments and restraints and a stay of all legal proceedings against Iran covered by the agreements. Later, the United States moved to intervene on appeal. On April 24, 1981, this

---

**1.** None of the appellees has asserted that their claims fall under this exception, although Pfizer asks for a remand to determine that they do not. *See* Part II *infra*.

**2.** The United States takes the position, and will urge affected American claimants to assert before the Tribunal, that changed circumstances have rendered some choice-of-forum clauses not "binding." *See* U.S. Br. at 28.

Court granted that motion and also narrowed the issues for decision at this time to those arising from the Statement of Interest and appellees' requests for remand without decision on the merits.

Since February 26, the United States has repeatedly emphasized the need for an expeditious resolution of these legal issues. Without conceding the point, it has informed this Court that "[f]ailure to transfer the assets within the prescribed time because of outstanding judicial attachments or orders might be regarded by Iran as a material breach of the Agreement, . . ." U.S. Br. at 6. Secretary of State Alexander Haig, Jr., in a sworn statement, has warned that, should the judiciary refuse to free Iranian assets, "the whole structure of the agreements may begin to crumble, and there could be set in motion a series of actions and reactions that would have serious consequences both for the claimants and for the foreign policy of the United States."

It was against this backdrop that the Court heard oral argument on May 15, 1981 and issued a judgment order on May 22, 1981 that (1) vacated all attachments and prejudgment restraints, (2) remanded the cases with instructions to stay further proceedings, and (3) denied the Government's request to vacate the award of partial summary judgment. Also on May 22, 1981, the First Circuit, in *Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800 (1st Cir. 1981), issued an opinion upholding the President's power to suspend the claims and vacate the prejudgment restraints in cases somewhat similar to those presently before us.

## II

■ The threshold issue is appellees' request for a remand of these questions to the District Court. They cite the principle that, when circumstances have changed on appeal, the preferred course is a remand to the District Court. *See Korn v. Franchard Corp.*, 456 F.2d 1206, 1208 (2d Cir. 1972). The Government, noting the pressure of time and the purely legal nature of the issues before this Court, opposes any remand. Since we are unable to ascertain any advantage that would accrue from a remand without decision, we deny the appellees' request for such a disposition.

The purpose of a remand, we assume, is to allow legally relevant and disputed adjudicative facts to be found. Despite considerable effort, the appellees have been unable to identify any disputed facts that bear in any way upon the Statement of Interest of the United States. Pfizer argues that the constitutionality of the President's actions turns in part upon their varying effects on the several classes of claimants. Those for example whose claims are not against the Iranian Government, but against certain Iranian nationals not acting under government control, face not only the suspension of their claims, Executive Order 12283 (Jan. 19, 1981), but also the inability to present them to the arbitral tribunal.

There are numerous difficulties with this position. At the outset, since none of the parties has alleged that its claim falls into that category, any ruling by this court on the constitutionality of paragraph 11 would be purely advisory. Second, the President's power to revoke the attachments does not depend upon the ability of the parties to seek relief from the Claims Tribunal. Finally, a judicial determination of the arbitrability *vel non* of the several claims would arguably violate Art. II, para. 3 of the Second Declaration and para. 17 of the First Declaration. Read together, they give Iran the right to seek a ruling from the Tribunal on any disputes about its jurisdiction. If, following remand, the Iranian defendants are willing to stipulate that they do not wish to seek such a ruling, the United States has stated that it has no objection to ending the suspension of claims that the parties agree are not arbitrable or otherwise barred. U.S. Br. at 29.

The experience of other circuits with analogous cases indicates to us that a remand cannot be justified on the grounds that disputed issues of material fact remain to be resolved. The Second Circuit, in remanding *New England Merchants National*

*Bank v. Iran Power Generation and Transmission Co.,* 646 F.2d 779 (2d Cir. 1981), did not refer to any specific factual disputes it wished resolved by the District Court. Instead, it was concerned that some of the parties in the 96 consolidated cases before it were not opposed to arbitration and therefore any decision by the Court on the executive agreements would be rendered in the absence of a live controversy. *See* 646 F.2d at 783. In addition, the Second Circuit did not have the benefit of any briefing on the crucial constitutional issues other than the Government's Statement of Interest. *See id.* at 783. In the instant cases, by contrast, we have had extensive briefing and oral argument from all sides.

The district court opinions extant which address the merits of the President's actions do not rely, at least as we read them, upon resolution of disputed factual issues. Judge Caffrey's opinion in *Chas. T. Main International, Inc. v. United States,* 509 F.Supp. 1162 (D.Mass.1981), *aff'd sub nom. Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority,* 651 F.2d 800 (1st Cir. 1981), although bottomed upon a stipulation of facts, refers only to the relevant legal materials that we discuss below.[3] Similarly, Judge Kelleher's opinion in *Security Pacific National Bank v. Government and State of Iran,* 513 F.Supp. 864 (C.D.Cal. 1981), reached and resolved all the outstanding legal issues on the basis of the United States Statement of Interest, without further factfinding.[4]

The United States has obligated itself to a series of undertakings that must be accomplished by July 19. Appellees have raised weighty constitutional and statutory objections to the actions of the Executive. We think all parties are entitled to a prompt judicial determination of the lawfulness of these settlement agreements and implementing orders. With that in mind,

we perceive no adjudicative facts that must be found before the merits are reached, and we deny appellees' request for remand without decision on the merits.

### III

The power of the President of the United States to settle the private claims of American citizens against foreign countries by executive agreement must be reconciled with the constitutional scheme of separated powers. This task is especially vital when those citizens have sought to invoke the aid of the judicial branch by filling complaints and receiving preliminary relief. Our inquiry begins, although it does not end, with the cases that have held that the President does have some power to conclude an executive agreement with a foreign sovereign without obtaining the advice and consent of two-thirds of the Senate.

*United States v. Belmont,* 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), was the first case to decide that an executive agreement has the force of law. In *Belmont,* the Soviet Union, by an executive agreement known as the Litvinov Assignment, transferred its claims against Russian nationals to the United States, including claims to a bank account in New York containing funds the Soviet Union had purported to nationalize in 1918. When the United States sued for the money, the District Court held that the nationalization decree constituted a confiscation violative of the public policy of the State of New York and accordingly dismissed the suit. 301 U.S. at 326–27, 57 S.Ct. at 758–59.

Justice Sutherland, writing for the Court, held for the United States on the grounds that the public policy of New York State could not "prevail against the international compact." *Id.* at 327, 57 S.Ct. at 759. Taking notice of the coincidence of the executive agreement with the President's deci-

---

**3.** The First Circuit, in affirming Judge Caffrey, similarly decided the constitutional and statutory issues on the basis of the relevant legal materials.

**4.** One claimant asserted that its claim was not arbitrable, and Judge Kelleher did order a hear-

ing so defendants could make a colorable showing that plaintiff's claim was within the Tribunal's jurisdiction. Since no claimant in these cases makes a similar assertion, we see no need for a remand.

sion to recognize the Communist regime in Russia, the court said that these events "validate[d] ... all acts of the Soviet Government here." *Id.* at 330, 57 S.Ct. at 760. Justice Sutherland went on to categorize the recognition and the agreement as part of one transaction. *Id.*

Narrowly construed, *Belmont* need stand for no more than that the President may place the United States in the position of assignee by means of executive agreement. The more crucial aspect of the case, the recognition of Russia's extraterritorial nationalization, could be read as based upon the President's decision to recognize the Communist regime combined with an expansive application of the act of state doctrine. *See* 301 U.S. at 327–30, 57 S.Ct. at 759–61.[5]

The legal effect of the Litvinov Assignment was again before the Supreme Court in *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942). In *Pink*, the Court held that the claims of alien creditors to those assets could not prevail against the interest asserted by the United States. Facing the question of presidential authority to validate the Russian nationalization decrees, Justice Douglas, delivering the Court's opinion, wrote: "The powers of the President in the conduct of foreign relations include the power, without consent of the Senate, to determine the public policy of the United States with respect to the Russian nationalization decrees." 315 U.S. at 229, 62 S.Ct. at 565. The Court felt that this power was a necessary incident of the President's plenary power to recognize foreign sovereigns. *See id.* at 229–30, 62 S.Ct. at 565–66.

The Court did repeat its understanding that the President has some inherent power to conclude international agreements without the advice and consent of the Senate: "A treaty is a 'Law of the Land' under the supremacy clause (Art. VI, Cl. 2) of the Constitution. Such international compacts and agreements as the Litvinov Assignment have a similar dignity. *United States v. Belmont....*" *United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942). But, again, the Court did not distinguish between what it saw as the President's power as superintendent of this country's foreign affairs,[6] and his power to conclude executive agreements. The Court said, "Recognition and the Litvinov Assignment were interdependent." *Id.*

This excursus into the *Belmont* and *Pink* cases was intended only to support our con-

---

**5.** Concurring in the judgment, Justice Stone, joined by Justices Brandeis and Cardozo, noted that there was no reason to decide the question of the executive agreement's effect on New York law, because state law did not forbid confiscation of a creditor's interest, such as the nationalized corporation's and thus the Soviet Union's, in a debt when its domiciliaries appear in court only as debtors, not creditors. *See* 301 U.S. at 334–35, 57 S.Ct. at 762–63.

**6.** The *Pink* court seemed to place significant reliance upon certain dicta in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936):

Power to remove such obstacles to full recognition as settlement of claims of our nationals ... certainly is a modest implied power of the President who is the 'sole organ of the federal government in the field of foreign relations.' *United States v. Curtiss-Wright Corp.*

*United States v. Pink*, 315 U.S. 203, 229, 62 S.Ct. 552, 565, 86 L.Ed. 796 (1942).

To the extent that denominating the President as the "sole organ" of the United States in international affairs constitutes a blanket endorsement of plenary Presidential power over any matter extending beyond the borders of this country, we reject that characterization. We think that Professor Henkin's analysis of the workings of the constitutional system of separated powers in the international arena is more suitable:

In the governance of foreign relations ... the political authority of the United States is lodged in the President and Congress.... The foreign relations powers also reflect commitment to Separation and checks-and-balances but what each branch can do alone, when the other is silent or even in the face of its opposition, is not determined by any 'natural' division. As they have evolved, the foreign relations powers appear not so much separated as fissured, along jagged lines indifferent to classical categories of governmental power: some powers and functions belong to the President-and-Senate; some can be exercised by either the President or the Congress, some require the joint authority of both.

L. Henkin, Foreign Affairs and the Constitution 32 (1972).

clusion that these cases, standing alone, do not provide an adequate basis on which to conclude that the President was acting within his constitutional authority in binding the United States to the two Declarations of January 19, 1981. *Belmont* and *Pink* not only fail to distinguish among the President's powers to recognize foreign governments, to determine the effect of foreign expropriation decrees, and to conclude executive agreements, but they also provide insufficient guidance to any court confronted, as we are, with the need to demarcate the President's executive-agreement power. Professor Henkin, speaking of these agreements, commented: "[T]he power to make them remains as vast and its constitutional foundations and limits as uncertain as ever." L. Henkin, Foreign Affairs and the Constitution 177 (1972).

We propose a more searching inquiry into the powers of the President, using the separation-of-powers analysis propounded by Justice Jackson in his concurrence in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634–55, 72 S.Ct. 863, 870–880, 96 L.Ed. 1153 (1952). Justice Jackson proposed a tripartite division for judicial review of claims that the President has unconstitutionally exceeded his authority, that depends upon the actions of the Congress:

1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right, plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. . . .

2. When the President acts in the absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have con-

current authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.

3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter.

343 U.S. at 635–37, 72 S.Ct. at 870–71 (footnotes omitted).

With this analysis as our point of departure, we turn to the claimed bases for the President's actions of January 19, 1981. We conclude, in Parts IV and V *infra*, that his vacation of the attachments and other restrains was expressly authorized by the International Emergency Economic Powers Act, and his suspension of the claims was an example of a continual executive practice in which the Congress has, at the very least, acquiesced.

## IV

The Presidential revocation of the license he issued permitting prejudgment restraints upon Iranian assets is an action that falls within the plain language of the IEEPA.[7] In vacating the attachments, he acted to "nullify [and] void . . . any . . . exercising any right, power, or privilege with respect to . . . any property in which any foreign country . . . has any interest . . . by any person . . . subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1) (Supp. II 1978).[8]

---

7. *Accord, Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 805–806 (1st Cir. 1981).

8. At the times and to the extent specified in section 1701 of this title, the President may, under such regulations as he may prescribe,

The House Report accompanying that legislation states that the language in question "basically parallels" section 5(b) of the Trading with the Enemy Act. H.R.Rep.No. 459, 95th Cong., 1st Sess. 14–15 (1977). The Supreme Court has stated that the President, acting under this statute, may disregard judicial attachments obtained after foreign assets have been frozen. *Orvis v. Brownell*, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953). Appellees rely on an earlier case dealing with the same executive actions, *Zittman v. McGrath*, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951), which held that attachments acquired after that freeze order were not legal nullities. We believe that the cases can be reconciled, but to the extent they cannot,[9] it is *Orvis* that controls.

The *Zittman* and *Orvis* cases both dealt with attachments issued in state courts following an order freezing alien assets. After the attachments in *Zittman* had been issued, but before similar writs were obtained in *Orvis*, the Federal Government issued a "General Ruling" explaining that its freeze order precluded attachments. Justice Jackson, who wrote the majority opinion in both cases, refused to grant retroactive effect to the General Ruling for a number of reasons, none of which would support maintenance of the attachments in the present case.

He first noted that the General Ruling was contradicted by other representations the Government had made with respect to the effect of its freeze order. *Zittman v. McGrath*, 341 U.S. 446, 452–53, 71 S.Ct. 832,

836–37, 95 L.Ed. 1096 (1951). In this case, however, the government's position has been consistent: it has maintained that attachments acquired after its freeze order of November 14, 1979 must be vacated at its discretion.

Justice Jackson also found that vacating the attachments for all purposes would frustrate important federal policies, and it is on this point that both *Orvis* and the present case can be most meaningfully distinguished. Justice Jackson stated that that failure to allow attachments would contradict the federal policy of allowing claimants to recover their losses out of the frozen assets. 341 U.S. at 457, 71 S.Ct. at 839. He noted that the attachments were intended to secure *quasi-in-rem* jurisdiction over the German defendants, and that without them, the claimants would be left without a forum in which to prove their claims. *Id.*

The attachments and other restraints imposed upon Iran in 1979 and 1980, however, were of no jurisdictional significance whatsoever, because *quasi-in-rem* jurisdiction against foreign sovereigns has been supplanted by *in personam* jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1330(a) (1976). In addition, we perceive no analogous policy contradiction in these cases. United States policy is perfectly consistent: it seeks to resolve a difficult foreign crisis and safeguard certain legitimate claims of Americans not by, as in *Zittman*, denying a forum, but by remitting the claimants to international arbitration.

---

by means of instructions, licenses, or otherwise—
(A) investigate, regulate, or prohibit—
(i) any transactions in foreign exchange,
(ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
(iii) the importing or exporting of currency or securities; and
(B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to,

or transactions involving, any property in which any foreign country or a national thereof has any interest;
by any person, or with respect to any property subject to the jurisdiction of the United States.
50 U.S.C. § 1702(a)(1) (Supp. II 1978).

**9.** Justice Douglas held the opinion that *Orvis* simply overruled *Zittman*: "But if we meant no more than what is now granted, the dissenting opinion in *Zittman* ... should have been made the law then rather than now." *Orvis v. Brownell*, 345 U.S. 183, 191, 73 S.Ct. 596, 600, 97 L.Ed. 938 (1953) (Douglas, J., joined by Frankfurter, J., dissenting).

It was the perceived need to maintain the attachments under state law for jurisdictional purposes that Justice Jackson referred to in *Orvis*:

> Because of the supremacy of the Federal Government on matters within its competence, the freezing order, while permitting an attachment for jurisdictional and other state law purposes, prevented the subsequent acquisition of a lien which would bind the [Alien Property] Custodian. . . .

*Orvis v. Brownell*, 345 U.S. 183, 188, 73 S.Ct. 596, 599, 97 L.Ed. 938 (1953). The cases, taken together, therefore indicate that the Supreme Court, while willing to keep the attachments in effect to maintain a forum for the claimants, would not give the attachments any effect as against a federal interest.[10] This reading of the cases is consistent with Justice Jackson's penultimate comments in *Zittman*: "This result . . . in no way impairs federal control over alien property, since petitioners admit that they cannot secure payment from the attached frozen funds without a license from the Custodian." 341 U.S. at 464, 71 S.Ct. at 842. Judicial refusal to lift the restraints now blocking the transfer of Iranian assets, by contrast, could well have extremely serious consequences that the United States has every interest in avoiding. Differences in the federal policy interest, in the purpose for which attachments are sought, and in the alternatives open to the claimants provide ample grounds for not regarding *Zittman* as limiting the President's power to vacate the attachments against Iranian assets.[11]

In short, we are faced with a situation in which the President is acting pursuant to an unequivocal statutory grant of authority. In this situation, we perceive no erosion of the constitutional principle of the separation of powers in upholding the actions of Presidents Carter and Reagan and in remanding these cases to the District Court with instructions to vacate all writs of attachments and other restraints on Iranian assets.[12]

## V

We speak next to the President's authority to suspend the claims of appellees against Iran. Before discussing the constitutionality *vel non* of the executive's actions, we think it of considerable value to determine precisely what the executive seeks to accomplish, because in considering whether the President has acted constitutionally, it is most helpful to ascertain what he did.

Executive Order 12294, issued by President Reagan on February 24, 1981 ordered "[a]ll claims which may be presented to the . . . Claims Tribunal . . . suspended. . . ." We note that the President did not order the litigation suspended, or the power of the courts to consider the claims suspended. Instead, he acted with respect to the claims only. We read this as an effort to modify not the jurisdiction of the courts, but the substantive rule of law they are to apply.[13] If constitutional, the Executive Order cre-

---

**10.** *Orvis* also supports the President's authority to issue purely revocable licenses allowing attachments, and then to revoke those licenses. In *Orvis*, Justice Jackson said that the attachments could not effect a transfer of assets because the Government license allowing such attachments was conditioned on not using them to effect a transfer. To interpret the license otherwise, he wrote, "would ignore the express conditions on which the consent was extended." 345 U.S. at 187, 73 S.Ct. at 598. He added: "Realistically, these reservations deprive the assent of much substance; but that should have been apparent on its face to those who chose to litigate." *Id.*

**11.** The First Circuit has also found *Orvis* rather than *Zittman* to be the controlling authority.

*Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 806–808 & n.9 (1st Cir. 1981).

**12.** To the extent that the appellees argue that the attachments constitute an interference with the judicial process contrary to Article III of the Constitution and the Foreign Sovereign Immunities Act, we decline to endorse these assertions for the same reasons articulated in Part V, where they are discussed with reference to the suspension of claims.

**13.** *Accord, Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 808–810 (1st Cir. 1981).

ates the situation in which appellees, in the words of Fed.R.Civ.P. 12(b)(6), have "fail[ed] to state a claim upon which relief can be granted."

With this in mind, we are not prepared to accept appellees' argument that the executive agreements and implementing orders constitute a limitation on the jurisdiction of the federal courts contrary to article III, which requires congressional action to modify the courts' adjudicatory authority. We are persuaded that the difference between modifying federal court jurisdiction and directing the courts to apply a different rule of law on appeal is a meaningful one. Chief Justice Marshall, writing in *United States v. The Schooner Peggy*, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), said that appellate courts were bound to apply the terms of a claims settlement treaty even when its application would require the reversal of a lower court judgment. He wrote:

> But if subsequent to the judgment and before the decision of the appellate court a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. If the law be constitutional, and of that no doubt in the present case has been expressed, I know of no court which can contest its obligation.

5 U.S. (1 Cranch) at 110, 2 L.Ed. 49. The Chief Justice did not perceive any jurisdictional assault on the federal courts in the settlement of the French Spoliation Claims, and we find none here.[14]

Nor do we read the case of *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), as requiring a different conclusion. In the *Klein* case, the Supreme Court held unconstitutional a statute (1) binding the courts to disregard a Presidential pardon in determining whether Southerners should be considered loyal and thus, under an earlier statute, able to receive the proceeds from the government's sale of their property, and (2) instructing the courts to dismiss actions

to recover those monies for want of jurisdiction. The Supreme Court found the statute defective because it attempted to dictate to the courts the probative weight of the pardons as evidence of loyalty, and it interfered with the President's exercise of his pardon power. 80 U.S. (13 Wall.) at 147, 20 L.Ed. 519.

Neither difficulty is raised by the President's actions in the instant cases. He is not attempting to supplant the judicial function as a trier of fact, but to modify the law. As we have stated above, *see* Part II *supra*, the only issues raised are strictly legal ones. And, of course, there is no interference with any other executive power.

There is language in *Klein* casting doubt upon congressional power to "prescribe the rules of decision to the Judicial Department" in pending cases. 80 U.S. (13 Wall.) at 146, 20 L.Ed. 519. But we subscribe to the following views:

> Given the context such language should surely not be read as casting doubt on the ancient principle, clear since the decision in *United States v. The Schooner Peggy*, . . . that the courts are obligated to apply law (otherwise valid) as they find it at the time of final judgment, including, when a case is on review, the time of the appellate judgment.

P. Bator, P. Mishkin, D. Shapiro, and H. Wechsler, Hart and Wechsler's the Federal Courts and the Federal System 316 n.4 (1973).

Our inquiry, then, is whether the President has the power to suspend the claims of Americans against foreign sovereigns through an executive agreement modifying substantive law and entered into without the advice and consent of the Senate or other congressional endorsement. Bearing on this decision are two particulars of the Presidential action with respect to the claims against Iran: (1) the executive asks

14. *Schooner Peggy* does not resolve the presidential-authority question in this case, because the settlement of the French Spoliation Claims was accomplished by treaty, not executive agreement. But the Court's analysis of the change wrought as one in substantive law, not jurisdiction, is relevant regardless of how that change was brought about.

only their suspension, not their cancellation and (2) the executive has provided an alternative forum capable of providing meaningful relief. With this in mind, we conclude that the President did possess such inherent power.[15]

## A. Congressional Acquiescence in Claims Settlements by Executive Agreement

When Congress has not spoken, and the President has acted, courts have traditionally looked to a consistent practice of similar actions unmarred by congressional objection to strike a workable accommodation between the principles of the separation of powers and the exigencies of governance. Justice Frankfurter, concurring in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 610–11, 72 S.Ct. 863, 897–98, 96 L.Ed. 1153 (1952), stated

> ... the content of the three authorities of government is not to be derived from an abstract analysis. The areas are partly interacting, not wholly disjointed. The Constitution is a framework for government. Therefore the way the framework has consistently operated fairly establishes that it has operated according to its true nature. Deeply embedded traditional ways of conducting government cannot supplant the Constitution or legislation, but they give meaning to the words of a

text or supply them. It is an inadmissibly narrow conception of American constitutional law to confine it to the words of the Constitution and to disregard the gloss which life has written upon them. In short, a systematic, unbroken executive practice, long pursued to the knowledge of Congress and never before questioned, .. making as it were such exercise of power part of the structure of our government, may be treated as a gloss on "Executive Power" vested in the President by § 1 of Art. II.

Justice Frankfurter was not the first to look to consistent executive practice in determining whether the President had acted beyond the powers vested in him by the Constitution or by a statute. In *United States v. Midwest Oil Co.*, 236 U.S. 459, 469, 35 S.Ct. 309, 311, 59 L.Ed. 673 (1915), the Supreme Court upheld a presidential withdrawal of public lands from mineral prospectors on the grounds that "[s]cores and hundreds of these orders have been made; ..." The Court, looking to precedent, explained that while earlier decisions do not mean "that the Executive can by his course of action create a power," they do "clearly indicate that the long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the withdrawals had been made in pursuance of its

---

**15.** We agree with the majority opinion of the First Circuit in concluding that the IEEPA does not empower the President to suspend the claims of American nationals against Iran and its instrumentalities. *See Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 808–809 & n.13 (1st Cir. 1981). In his concurrence, Judge Breyer had suggested that the IEEPA did authorize the President to suspend claims, because "[a] civil lawsuit is surely the 'exercising' of a 'right' with respect to 'property'." 651 F.2d at 816.

We associate ourselves with the majority's response to these views:

> Nevertheless, we feel uneasy in resting on such a construction. To say that an unliquidated claim *in personam* for money damages is a 'right' with respect to 'property,' or that it is 'acquisition' of 'property,' or that it is a 'transaction involving ... property' simply because it may someday be reduced to judgment and capable of execution is to render a technical word rich in ancient teaching amorphous and all inclusive.

651 F.2d at 809 n.13. A claim asserted *in personam*, rather than *in rem* or *quasi-in-rem*, has simply no necessary relation to any of defendant's property located in the jurisdiction.

The First Circuit did point out that IEEPA cannot be read as barring the President's effort to settle claims against Iran:

> While we therefore conclude that we cannot rest on any express or implied grant of power from Congress in IEEPA, we find no hint of congressional *disapproval* of the power to settle claims in these circumstances. Even if IEEPA does not confer such a power, it shows Congress' willingness to give the President wide discretion in dealing with issues affecting foreign assets during periods of international crisis. In addition, we are told that the President notified Congress of the agreement with Iran, as required by IEEPA, and that Congress has not registered opposition to any provision, including that purporting to suspend judicial claims and substitute arbitration.

651 F.2d at 809 n.13.

consent or of a recognized administrative power in the Executive in the management of the public lands." 236 U.S. at 474, 35 S.Ct. at 313.

We find that there is a long-standing practice of settling private American claims against foreign governments through executive agreements. According to the Department of State's Digest of International Law, "[i]t has not been the practice of the Department of State to obtain the approval of the Senate for the settlement of international claims, and a request for Congressional action is not made unless appropriations appear to be necessary." 14 M. Whiteman, Digest of International Law 247 (1970). The parties agree that scores of these executive agreements have been entered into since the case of the "Wilmington Packet" in 1799. See Lillich, The Gravel Amendment to the Trade Reform Act of 1974: Congress Checkmates a Presidential Lump Sum Agreement, 59 Am.J.Int'l L. 837, 844 (1975). And it is a practice that continues today: the President has entered into binding settlements with foreign nations compromising the claims of U.S. nationals at least 10 times since 1952 without seeking the advice and consent of the Senate.[16]

We are urged by appellees to disregard all claims settlements entered into before 1976 on the grounds that the Foreign Sovereign Immunities Act, passed that year, restricted whatever power the President may have had to conclude such executive agreements. Leaving aside the executive agreements that have taken effect since 1976 for a moment, we are still unable to grasp what adverse effect the FSIA should have on presidential power to settle claims. The FSIA, drafted by the Departments of State and Justice, and thus unlikely to have been designed to restrict executive authority by implication, codified the previously-extant legal principle known as the restrictive theory of sovereign immunity. Briefly

put, this theory holds that a foreign sovereign may be sued for its actions that are commercial or otherwise private in nature. 6 M. Whiteman, *supra*, at 569–71 (Tate Letter). Between 1952 and 1976, the courts turned to the State Department for a determination of whether the sovereign defendant before them was entitled to this immunity. *See id.* at 570, 701–08. The FSIA, in contrast, by codifying the principles of the restrictive theory into positive law, vests the courts with the authority to make such determinations without recourse to the executive branch. *See* H.R.Rep.No.1487, 94th Cong., 2d Sess. 7 (1976). As such, it may be construed as explicitly lessening executive authority over determinations of immunity.

Appellees place principal reliance upon the FSIA's provision allowing United States courts to, in appropriate circumstances, assert *in personam* adjudicatory authority over a foreign sovereign. The presidential actions with respect to the claims against Iran constitute, appellees urge, a derogation from that broad jurisdictional grant. Since, however, we have concluded that the President's actions do not constitute an effort to modify the courts' jurisdiction, we are unable to conclude that the FSIA may fairly be read as a congressional effort to limit such settlements.

We take somewhat more seriously appellees' argument that the pre-1952 claims settlements are of little precedential value, because before 1952, and the announcement of American adherence to the restrictive theory of sovereign immunity, such settlements were the only remedy for American claimants. Thus, appellees' argument runs, pre-1952 settlements constitute an act of largesse to claimants otherwise without hope of recovery while appellees had every hope of recovery through the judicial process. Assuming for the moment that their characterization of the position of pre-1952 claimants is correct, and cases as venerable

---

16. Those agreements are 30 U.S.T. 1957 (1979) (People's Republic of China); 27 U.S.T. 3993 (1976) (Peru); 27 U.S.T. 4214 (1976) (Egypt); 25 U.S.T. 227 (1974) (Peru); 24 U.S.T. 522 (1973) (Hungary); 20 U.S.T. 2654 (1969) (Japan and the U. S. Trust Territory of the Pacific Islands); 16 U.S.T. 1 (1965) (Yugoslavia); 14 U.S.T. 969 (1963) (Bulgaria); 11 U.S.T. 1953 (1960) (Poland); 11 U.S.T. 317 (1960) (Rumania).

as the *Schooner Peggy* imply that it may not be, we need only note that since 1952 and the coming of the restrictive theory of sovereign immunity, the executive has concluded at least ten binding settlements. We think that this constitutes a long-standing and settled practice regardless of earlier history.

Our willingness to sustain these executive agreements as part of a long-standing practice is fortified by the statements of distinguished judges through the years, and the *Belmont* and *Pink* cases themselves. While we have urged a narrow reading of those cases, *see* Part III *supra*, and while they did not discuss the President's power to nullify the claims of *American* nationals by executive agreement, they do lend support to the proposition that the President need not seek the advice and consent of the Senate for all such settlements.

Indeed, Justice Frankfurter, concurring in *Pink*, was willing to endorse a view of the President's claim settlement power generous enough to encompass the case before us. He stated, "That the President's control of foreign relations includes the settlement of claims is indisputable." *United States v. Pink*, 315 U.S. 203, 240, 62 S.Ct. 552, 570, 86 L.Ed. 796 (1942) (Frankfurter, J., concurring). Similarly, Judge Learned Hand said

> The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government; and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations.

*Ozanic v. United States*, 188 F.2d 228, 231 (2d Cir. 1951) (footnote omitted).

Of especial significance in this "zone of twilight" is the record of the Congress's actions when it disapproves of a claims settlement embodied in an executive agreement. For example, when the President settled over $105 million in claims against Czechoslovakia for $20.5 million, Lillich, *supra*, at 839–40, conditional on Congress's granting Czechoslovakia most-favored-nation status, Congress moved quickly to demonstrate its displeasure with the settlement by passing a law requiring its renegotiation, *id.* at 841–42, and refusing to grant most-favored-nation status.

Professor Lillich, commenting on this statute, said that it indicates that "Congress ... has aroused itself from its attitude of benign neglect," and that it connotes a change from past practice in which "Congress has abdicated its responsibilities in the process of claims settlement." *Id.* at 846. We would be confronted with a very different case if Congress had enacted legislation, or even passed a resolution, indicating its displeasure with the Iranian agreements, although we express no opinion at this time on its outcome. We mention the abortive Czechoslovakian claims settlement only to justify our conclusion that the authority of the Congress is not being trenched upon in these cases, in which it has apparently chosen not to act. *See* note 15 *supra*. Nothing in this opinion should be read as foreclosing or eroding any powers to block or amend claims settlements that the Congress may one day choose to assert.

B.  *Vacation of the Award of Partial Summary Judgment*

■ We decline to grant the government's request for a vacation of the partial summary judgment in favor of appellees AIG and Continental Corp. on the issue of liability rendered by the District Court on July 10, 1980, 493 F.Supp. 522, because we believe that this intrusion on the judicial process is not warranted by the terms of the executive agreements, implementing executive orders, or the relevant regulations. Of equal significance is our conclusion that no untoward consequences will flow from staying that litigation after the partial summary judgment rather than at a point just prior to its award.

Although we have explained earlier why we cannot agree with appellees' suggestion that the executive actions in these cases amount to a withdrawal of federal court jurisdiction without the consent of the Congress, as required by Article III, we do take cognizance of the separation-of-powers problems raised by an executive effort to affect the outcome of a pending case. *See United States v. Klein*, 80 U.S. (13 Wall.) 128, 146–47, 20 L.Ed. 519 (1872). We therefore think it advisable to limit the effect of these agreements on the judicial process to the greatest extent possible consistent with the international obligations incurred by the executive agreements of January 19, 1981.

We note that the American commitment in the First Declaration "to nullify all attachments and judgments" may be read in two ways. One plausible reading, we believe, is that the term "judgments" used in conjunction with the word "attachments" refers to other forms of preliminary and provisional relief in the nature of attachments, such as was awarded by the District Court in these cases. This interpretation is strengthened by Executive Order 12294 issued by President Reagan on February 24, 1981, which ordered all pending claims against Iran or its instrumentalities "suspended," but did not require the vacation of extant judgments on the merits.

A final factor militating against granting the government's request to vacate the partial summary judgment is the absence of any regulation directing the courts to take such a step in the revised Iranian Assets Control Regulations of February 26, 1981. 46 Fed.Reg. 14330–37 (1981) (to be codified at 31 C.F.R. Part 535). While new 31 C.F.R. § 535.218 (1981) voids all existing attachments and similar restraints, and new 31 C.F.R. § 535.222 (1981) suspends all judicially-cognizable claims for relief, no section of the new regulations purports to reverse or require the vacation of these judgments on the merits.

These legal materials lead us to believe that refusal to order this summary judgment vacated will not constitute, at least in the eyes of the United States, a breach of this country's obligations under the two Declarations. Since the appellees are prohibited by the agreement from proving damages or in any way executing upon their partial summary judgment, appellants are not prejudiced by allowing it to stand. After the arbitration has run its course, and if the judicial process resumes, appellants will be able to contest the summary judgment award. Finally, since the United States was not a party to the proceedings in the District Court, we do not see how the summary judgment award can be asserted by appellees in any action against the United States. *See* Part VI *infra.*

The United States argued that the summary judgment should be vacated because it had been entered in violation of 31 C.F.R. §§ 535.203(e), .504(b)(1) (1980), which prohibit entry of final judgment without license. Appellees vigorously contest this assertion. We decline to rule on it because (1) it was not presented in the Statement of Interest and thus it arguably dehors the scope of this Court's April 24, 1981 order limiting the issues for consideration to those arising from that statement and (2) the United States remains free, if and when the District Court resumes consideration of these cases, to argue this point either on appeal or before the District Court.

## VI

The last contention raised by the appellees is that, if the President did have the power to suspend their claims and void their attachments, then such actions constitute a taking of their property for which just compensation must be paid. Although the Supreme Court has never found an executive settlement of private claims to constitute a compensable taking, L. Henkin, Foreign Affairs and the Constitution 263 (1972), the Court of Claims has continually implied that in a proper case it would consider cancellation of private claims by settlement to be such a taking, *see Aris Gloves, Inc. v. United States*, 420 F.2d 1386, 1391, 1396 (Nichols, J., concurring) (Ct.Cl.1970); *Gray v. United States*, 21 Ct.Cl. 340, 392–93

(1886). Without deciding that issue, we hold that (1) the applicability of the Taking Clause to the claims suspension is an issue not yet ripe for review [17] and (2) the vacation of the restraints was not a taking.

In looking at the claims suspension as a possible taking, we first note that we do not have any assurance that the claimants will suffer any loss. Although their claims for judicial relief have been suspended, they have been remitted to a forum apparently capable of granting meaningful relief. There are a number of possible outcomes. Some claimants may prevail before the arbitration panel and thus incur no loss. Others who either do not succeed of the merits or perhaps are unable to satisfy their awards may proceed along one of two routes: (1) they may attempt to seek relief from the stay and revival of their claims or (2) they may attempt to seek relief from the United States before the Court of Claims under the Tucker Act, 28 U.S.C. §§ 1491, 1502 (1976).

Appellees aver that this Court must rule on the availability *vel non* of a Tucker Act remedy at this time, citing the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), as controlling authority. We are of the opinion, however, that those cases are distinguishable. To understand how we arrived at that conclusion, some explanation of the issues in those cases, which grew out of the congressional effort to salvage the bankrupt railroads of the Northeast by, *inter alia*, transferring many of their assets to the Consolidated Rail Corp., *see* 419 U.S. at 108–09, 95 S.Ct. at 341–42, is in order.

Among other objections interposed to the legislation accomplishing the reorganization were at least two based upon the Taking Clause. The first was the assertion that legislative provisions requiring surviving railroads to operate unprofitable services constituted an "erosion taking" of their property, *id.* at 118, 123–24, 95 S.Ct. at 346, 348–49. The second assertion was that receipt of Conrail securities of unknown value in payment for the compulsory conveyance of railroad assets to the new entity was a "conveyance taking." *Id.* at 118, 137, 95 S.Ct. 346, 355. The Supreme Court ruled that the Tucker Act was available to compensate for any losses incurred through such takings. *Id.* at 136, 148, 95 S.Ct. at 354, 361. Appellees argue that the Court, in similar fashion, should reach the Tucker Act question to remove any doubt with respect to the Taking Clause.

The "erosion taking" does not provide adequate precedent for appellees' request because the probability of losses to be incurred by the railroads was a demonstrated fact, not speculation. Justice Brennan, conceding that there had been no "definitive determination" that the feared erosion would reach a level constituting a taking, *id.* at 123, 95 S.Ct. at 348, nevertheless adverted to record evidence leading to the almost inescapable conclusion that compelled operation of the Penn Central lines would constitute a taking: (1) the District Court's finding that the lines could not be operated on a profitable basis and (2) the parties' stipulation that the Penn Central had lost $851 million in less than three years. *Id.* at 124, 95 S.Ct. at 349. We have no similar facts before us that would lead us to find a taking. We have no reason to believe that the arbitration panel will not render meaningful relief. We have no reason to believe that the $1 billion security fund will not cover all meritorious claims. We have no reason to believe that the Iranians will not replenish the fund as they have agreed to do. We have no reason to believe that if they do not replenish the fund, then the prevailing claimants will be unable to obtain worldwide enforcement of any award according to the terms of the declarations. Finally, and by no means of least importance, we have no assurance that the appellees' claims are meritorious, and thus that executive action has taken anything of value.

---

17. *Accord, Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 813–814 (1st Cir. 1981).

Turning to the conveyance taking issue of the railroad cases, we again find a situation dissimilar to that before us. The Court chose to reach the Tucker Act remedy because, among other reasons, "there is no better time to decide the constitutionality of the Act's mandatory conveyance scheme to minimize or prevent irreparable injury." *Id.* at 144, 95 S.Ct. at 359. In these cases, however, we think there is a better time: when and if the United States moves to dismiss the claims in District Court. The parties have not irretrievably lost their judicial remedies;[18] rather, those remedies have been suspended pending arbitration.

Before the doors of the court are forever closed to these appellees and those similarly situated, we presume that they will be able to argue that such relief as may be realized through arbitration has failed to make them whole and therefore that dismissal of their claims would constitute a compensable taking. At that time the District Court will be able to determine whether any taking has in fact occurred and, if so, what should be done. The District Court, of course, may, before reaching any taking question, demand that the claimants prove that they would succeed on the merits, and that the judicial relief sought was not barred by act of state, sovereign immunity or other doctrines.

Therefore, we decline to rule on whether the suspension of the claim would, if later determined to be a taking, entitle the appellees to relief under the Tucker Act. We wish to emphasize, however, that we expect that they would be able to raise such a claim after the arbitration had run its course. The above discussion has also demonstrated that any determination of whether suspension of the claims constitutes a compensable taking is premature, because this Court is wholly without warrant in fact to conclude that appellees are likely to suffer any compensable loss.

■ We think that vacation of the attachments is not a taking for which just compensation must be paid. Revocation of a license to attach, explicitly made revocable, cannot be considered a taking, because those claimants proceeding under such license had no entitlement to the attachments that would constitute property capable of being taken.[19]

The sequence of events is not in dispute: the President suspended the right to restrain Iranian assets; he then issued a revocable general license permitting pre-judgment restraints; under that license appellees received such restraints. Assuming for the moment that a writ of attachment or similar court order may be under some circumstances a property interest, we fail to grasp how such interest obtained only by grace of a revocable license can be thought of as property. The holders of the interests had no reasonable expectation that, against the factual backdrop of an unresolved international crisis, the President would not revoke what he had granted. They make no claim that the executive led them to believe that their attachments were secure. Without a reasonable expectation that their restraints were protected, the appellees cannot claim any property interest in those restraints. If so, the President took nothing on January 19.

The cases establish that revocable permits granted with respect to other types of property do not establish an entitlement which, if taken by the government, requires compensation. In *Acton v. United States*, 401 F.2d 896, 899 (9th Cir. 1968), *cert. denied*, 395 U.S. 945, 89 S.Ct. 2018, 23 L.Ed.2d 463 (1969), the Ninth Circuit held that government revocation of a revocable permit to prospect for uranium on public lands was not a taking because "a license does not

18. As we conclude *infra* that the dissolution of the preliminary restraints was not a taking, appellees cannot rely on those restraints to argue that the enforceability of their claims was assured and that therefore their suspension in favor of alternate relief constitutes irreparable injury requiring a Tucker Act determination at this time. Cf. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 122, 144, 95 S.Ct. 335, 348, 359, 42 L.Ed.2d 320 (1974).

19. *Accord, Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 807–808 (1st Cir. 1981).

constitute property for which the Government is liable upon condemnation." The *Acton* court relied upon *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946), in which the Supreme Court held that government condemnation of a leasehold terminable by condemnation was not a compensable taking. The Court explained: "With this [termination] clause . . . the tenant has no right which persists beyond the taking and can be entitled to nothing." 327 U.S. at 376, 66 S.Ct. at 599.

We think appellees were in the same position. They lacked any reasonable basis on which to arrive at the sense of legally-protected possession, or entitlement, that forms the basis of property rights. This is not a case such as *Battaglia v. General Motors Corp.*, 169 F.2d 254, 259–61 (2d Cir.), *cert. denied*, 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425 (1948), in which the Second Circuit said that congressional revocation of a right to sue for overtime pay granted by an earlier statute was not a compensable taking because Congress's commerce power could modify or nullify rights it had created. We do not subscribe to the doctrine that what the government gives, the government may take away, regardless of the expectations it has engendered. We only say that in the context of an expressly-revocable license, the appellees cannot assert a reasonable expectation of interests created under its provisions, and thus do not enjoy any property rights with respect to those interests.

### VII

We have concluded that the request of the United States to remand these cases with instructions to vacate the attachments and all other preliminary and provisional remedies and to stay any further progress in the litigation should be granted, but that its request to instruct the District Court to vacate the orders of partial summary judgment in Nos. 80–1779 and 80–1891 should be denied. We have no occasion to reach the issues briefed by the parties before the claim settlements, and we suspect that with respect to the attachments those issues have been mooted.[20] To the extent that they related to the partial summary judgments they have not yet been mooted. We expect that, after the arbitral process has run its course, plaintiffs may petition the District Court for relief from the stay and that the United States may attempt to dismiss the cases. If circumstances are appropriate, the District Court may allow the appellants to renew their appeal of the partial summary judgments; otherwise, we assume that all issues would be decided in the first instance by the District Court.

*It is so ordered.*

McGOWAN, Circuit Judge, separate statement in which JAMESON, Circuit Judge, joins:

■ Although I have joined in the opinion of the court, I write separately to state my belief that the Hostage Act of 1868, 22 U.S.C. § 1732 (1976), provides an additional source of authority for the President's actions in this case, extending to the suspension of the claims. The conclusion I reach that executive action was bottomed on both inherent powers and those delegated to the President by this statute avoids whatever separation-of-powers difficulties reside in judicial reliance solely upon a claim of inherent executive power.

President Reagan, in issuing Executive Order 12294, expressly identified 22 U.S.C. § 1732 as one of the statutory foundations of the powers exercised by him in that order.[1] That provision reads, in its entirety:

Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such im-

---

**20.** *Accord, Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority*, 651 F.2d 800, 805 n.7 (1st Cir. 1981).

**1.** President Carter, in issuing Executive Orders 12278–84 on January 19, 1981, also expressly relied upon section 1732 as a source of authority for those orders.

prisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress.

The argument that section 1732 has significance for this case starts with the proposition established by the holding of *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), namely, that a delegation of power to the President to act in foreign affairs is not susceptible to attack on the grounds that it is overbroad.[2] Justice Sutherland evidently felt that broad delegations of power to the executive were necessary to the conduct of this country's foreign relations:

[I]f, in the maintenance of our international relations, embarrassment . . . is to be avoided and success for our aims achieved, congressional legislation which is to be made effective through negotiation and inquiry within the international field must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissable were domestic affairs alone involved.

299 U.S. at 320, 57 S.Ct. at 221.

The legislative history of the Hostage Act indicates that it was designed to accord the President a broad discretion to resolve a matter usually regarded as of the utmost urgency—the taking of American nationals as hostages. The proponent of the language ultimately enacted into law, Senator Williams of Oregon, asserted to the Senate that

If you propose any remedy at all, you must invest the Executive with some discretion, so that he may apply the remedy to a case as it may arise. As to England or France he might adopt one policy to relieve a citizen imprisoned by either one of those countries; as to the Barbary Powers, he might adopt another policy; as to the islands of the ocean, another. With different countries that have different systems of government he might adopt different means.

46 Cong.Globe 4359, 40th Cong., 2d Sess. (1868). His opponent, Senator Howard, urged unsuccessfully that Senator Williams' language would "place in the hands of the President . . . [a] broad and almost illimitable discretion." *Id.*

Senator Williams also made plain his objection to language that would not vest the President with the discretionary power of his amendment:

. . . I do not see, if we mean anything by this legislation, why we cannot provide that it shall be the duty of the President to take some specific action in case an American citizen is wrongfully imprisoned in a foreign country. If we are not willing to make any such provision as that, then, of course, we are not willing to assume the responsibility of protecting American citizens abroad. It seems as though we were frightened at something; we are afraid of somebody. . . .

. . . .

. . . . The Senator from Massachusetts is alarmed because this amendment, as he says, proposes to put a dangerous power in the hands of the President. Are we

---

**2.** Justice Jackson arrived at a similar reading of *Curtiss-Wright:*

Curtiss-Wright . . . involved, not the question of the President's power to act without congressional authorization, but the question of his right to act under and in accord with an Act of Congress. The constitutionality of the Act under which the President had proceeded was assailed on the ground that it delegated legislative powers to the President. . . .

. . . .

That case . . . held that the strict limitation upon congressional delegations of power to the President over international affairs does not apply with respect to delegations of power in external affairs.

*Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 635–36 n.2, 72 S.Ct. 863, 870–71 n.2, 96 L.Ed. 1153 (Jackson, J., concurring).

afraid to trust the President with the power of protecting American citizens? *Id.* at 4332–33.

Applying the Hostage Act to this case would not place a limitless and dangerous power in the hands of the President, for there are at least two checks on the President's power under this law. The first, arising from the language and legislative history, is that the measures taken by the President must "not amount[ ] ... to acts of war." 22 U.S.C. § 1732 (1976). Senator Williams stated:

> Does this authorize him to violate any law of nations, or to resort to any violent or forcible measures? He is to do all he can under the Constitution and laws in every way to secure the release of a citizen; and nothing more is required of him by this amendment.

46 Cong.Globe 4333, 40th Cong., 2d Sess. (1868).

The second check is that articulated by the District Court in *Narenji v. Civiletti,* 481 F.Supp. 1132 (D.D.C.) *rev'd on other grounds,* 617 F.2d 745 (D.C.Cir.1979), *cert. denied,* 446 U.S. 957, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). *Narenji* involved a challenge to an Immigration and Nationalization Service regulation requiring "all Iranian nonimmigrant post-secondary students [to] report to the nearest [INS] office for identification and examination of status." 481 F.Supp. at 1134. Judge Joyce Hens Green, in holding the regulations unconstitutional, referred in a footnote to the Hostage Act:

> [The INS] apparently believ[es], as does the Court, that while it may give the President some extra latitude to deal militarily or economically with a foreign nation holding American citizens, it does not act to authorize the Chief Executive to abrogate individual rights guaranteed by the Constitution.

*Id.* at 1141 n.7. Judge Green's sound analysis does not bar reliance on section 1732 as a source of executive power to suspend the claims against Iran because their suspension, without more,[3] does not abrogate any individual rights.

One limit not to be found in the Hostage Act is that suggested by the appellees in their reading of *Worthy v. Herter,* 270 F.2d 905 (D.C.Cir.), *cert. denied,* 361 U.S. 918, 80 S.Ct. 255, 4 L.Ed.2d 186 (1959)—that the Hostage Act only empowers the President to take "diplomatic" measures, among which may not be counted the suspension of claims against Iran. The *Worthy* court considered the President's power to declare parts of the world off-limits to travelling Americans and to deny passports to citizens refusing to promise they will abide by the restrictions. 270 F.2d at 907. The Court considered the President's actions to be part of his duty to aid Americans in trouble abroad under the Hostage Act, and mentioned that to fulfill the mandate of Congress he must use "diplomatic ... instrumentalities." *Id.* at 910. The appellees apparently read that phrase as limited to moral suasion, although it would seem that the pacific resolution of an international crisis by negotiation and compromise is the quintessence of diplomacy. *Worthy* does not limit the applicability of the Hostage Act to the present case.

If the Congress can be taken as imposing, by the language of the Hostage Act, a continuing responsibility of some degree upon the President with respect to effecting the release of American citizens wrongfully detained by foreign governments, surely it must be thought of as encompassing the compelling need that developed in Iran. And when the successful action taken by the President is the peaceful deploy-

---

**3.** The allegation that appellees' Fifth Amendment right to just compensation is being abrogated depends upon not only a taking but also a failure to render just compensation. In relying upon section 1732 as a source of presidential authority, I do not in any way intend to cast doubt upon appellees' claim for just compensation. Section 1732 does not shed any light on that particular claim. In fact, a finding that the President had the power to suspend the claims is a prerequisite to awarding compensation, because if the Court had found that he lacked such power, his actions would not have had any effect upon the judicial process. No claim would have been suspended, and therefore no taking would have occurred.

ment of the economic weapons available to him in the form of the legally blocked assets, the authors of the Hostage Act would unquestionably have thought that he was acting well within the consciously limited powers they were at pains to vest in him. Whatever potential for abuse these powers may conceivably have in all the circumstances that can be hypothesized, no such danger can be seen in their actual utilization in this case. I would conclude that both consistent past practice in which Congress has acquiesced and a statute passed by Congress, broad in language but limited in applicability by the factual trigger of hostage-taking, support the President's actions.

MIKVA, Circuit Judge, separate statement:

I join fully in the opinion of the court. I write separately only to state my uneasiness at the government's attempt to find an additional source of presidential authority in a sweeping interpretation of 22 U.S.C. § 1732 (1976), the current codification of section 3 of the Act of July 27, 1868, "concerning the Rights of American Citizens in foreign States," ch. 249, 15 Stat. 223. "The Hostage Act" appears to be a sobriquet newly coined for the purposes of the Iranian crisis. Certainly that name had never before appeared in any of the reported cases alluding to the statute, nor had any court ever held that the statute actually empowered the President to do anything. *But see Narenji v. Civiletti*, 617 F.2d 745, 753 (D.C.Cir.1980) (statement of MacKinnon, J., on denial of rehearing en banc); *Agee v. Muskie*, 629 F.2d 80, 96–98 (D.C. Cir.) (MacKinnon, J., dissenting), *cert. granted*, 449 U.S. 818, 101 S.Ct. 69, 66 L.Ed.2d 20 (1980).

The 1868 Act was not designed to concentrate vast powers in the President during rare incidents of international hostage-taking; rather, it directs the President to act whenever the imprisonment of an American citizen by a foreign government "appears to be wrongful and in violation of the rights of American citizenship." The floor debates demonstrate that the major stimuli behind the congressional sense of urgency were the involuntary repatriation of naturalized American citizens visiting Europe, *see, e. g.*, 46 Cong.Globe 4211 (1868) (remarks of Sen. Howard), and British arrests of Americans for alleged complicity in the Fenian cause in Ireland, *see, e. g., id.* at 4212 (remarks of Sen. Conness). These governments had no interest in releasing our citizens for a price, and Congress was not concerned about the President's ability to raise ransom.

The measures contemplated as appropriate responses were all intended to bring pressure on the offending foreign nation; the House bill had gone so far as to encourage the President to "suspend in part, or wholly, commercial relations with the said Government," or if that failed, "to order the arrest and to detain in custody any subject or citizen of such foreign Government who may be found within the jurisdiction of the United States," *see id.* at 4205. Senator Williams, the author of the language ultimately enacted, illustrated the "means, not amounting to acts of war," that the President ought to employ:

But, sir, he may negotiate for the release of an American citizen imprisoned in a foreign country. He may use all the influences that he can to secure his restoration to liberty; and cases may arise where it would be the duty of the Executive of the nation, and where he ought to have the power at once, without any delay, to wrest an American citizen from the clutches of a despot in a foreign country. I can imagine many cases where the Executive should be invested with the power at once to proceed and vindicate the rights of American citizenship upon foreign soil by all the power of the nation.

*Id.* at 4233. Nowhere does Senator Williams suggest that the President is empowered to act domestically against American citizens for the appeasement of the foreign government.

The 1868 Act was passed in a wave of indignation over intolerable affronts to the national honor. Its proponents vied to dis-

play their willingness to defy the powers of Europe and to trust in the efficacy of a strong Executive response. When Congress is impassioned by the transgressions of a foreign state, the legislative process is not always exercised with precision. The proponents of this Act were more interested in issuing a ringing call to action than in defining the scope of the President's duty. *See id.* at 4333 (remarks of Sen. Williams and Sen. Conkling). As a result, the breadth of the Act's language reflects a full range of options in diplomacy and aggression. But in such a setting, Congress could not be expected to anticipate that a century of total obscurity would wrench that language from its context and leave it with no limitations except the explicit proviso about acts of war and the contrary commands of other law. This jingoistic ultimatum must be construed in the light of its legislative history.

I think that the legislative history also makes it clear that the statute does carry an implied term of limitation: the President shall use such means, not amounting to acts of war, *directed against the offending foreign government,* as he may think necessary and proper to obtain or effectuate release. The 1868 Act is not a blanket delegation of all congressional powers, foreign and domestic, to employ every means not constituting an act of war or a constitutional violation. Nor does the statute empower the President to confer on himself the right to perform any act he chooses merely by agreeing with a foreign nation that he shall perform it.

It may in fact be that the range of diplomatic options encompassed by the 1868 Act includes the settlement of claims against foreign states. But if this is so, it is only because of the longstanding tradition of international practice that the court's opinion cites as the basis of the President's authority. Without this tradition, I would not regard the 1868 Act as relevant to the claims settlement issue. That Act is too dangerous a reed to provide independent support for actions whose consequences are primarily domestic.