651 F.2d 800
 CHAS. T. MAIN INTERNATIONAL, INC., Plaintiff, Appellee,
v.
KHUZESTAN WATER & POWER AUTHORITY, et al., Defendants, Appellants,
and
The First National Bank of Boston, et al., Defendants, Appellees.
CHAS. T. MAIN INTERNATIONAL, INC., Plaintiff, Appellant,
v.
UNITED STATES of America, et al., Defendants, Appellees.
CHAS. T. MAIN INTERNATIONAL, INC., Plaintiff, Appellant,
v.
KHUZESTAN WATER & POWER AUTHORITY, et al., Defendants, Appellees.
 Nos. 80-1027, 81-1176, 81-1251 and 81-1252.
 United States Court of Appeals,
First Circuit.
 Argued May 8, 1981.
Decided May 22, 1981.
 
 Samuel Hoar, Boston, Mass., with whom Carol Goodman, Kenneth A. Cohen, Kenneth W. Simons, Leonard G. Learner, Andrew S. Hogeland, and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for Chas. T. Main International, Inc.
 Michael F. Hertz, Atty., Civ. Div., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., Mark B. Feldman, Acting Legal Adviser, Timothy E. Ramish, Atty., Dept. of State, Robert E. Kopp, John F. Cordes, and Susan J. Herdina, Attys., Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for the United States of America.
 Thomas G. Shack, Jr., Washington, D. C., with whom Raymond J. Kimball, Abourezk, Shack & Mendenhall, P. C., Washington, D. C., William A. Zucker, and Gadsby & Hannah, Boston, Mass., were on brief, for Khuzestan Water & Power Authority, et al.
 Leonard B. Boudin, New York City, with whom Eric M. Lieberman, Michael Krinsky, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, P. C., New York City, Dorian Bowman, and Bowman & Bowman, Cambridge, Mass., were on brief, for Bank Markazi Iran.
 Stephen M. Truitt, and Wald, Harkrader & Ross, Washington, D. C., on brief for T. C. S. B. Inc., and Harza Engineering Company International, amici curiae.
 Edwin S. Matthews, Jr., John Carey, and Coudert Brothers, San Francisco, Cal., on brief for Sylvania Technical Systems, Inc., amicus curiae.
 Robert B. Davidson, Lawrence W. Newman, Jean Bernstein, and Baker & McKenzie, New York City, on brief in support of Right to Compensation, amici curiae.
 Before COFFIN, Chief Judge, CAMPBELL and BREYER, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 Chas. T. Main International, Inc. (Main) is an engineering firm incorporated in Massachusetts and having its principal place of business in Boston. On November 20, 1979, Main brought suit in the District Court for the District of Massachusetts against the government of Iran and various Iranian governmental entities to obtain payment for services it had rendered in Boston and Iran in connection with certain Iranian electrification projects. Chas. T. Main International, Inc. v. Khuzestan Water & Power Authority, No. 79-2304C (Main v. KWPA ). Main's claims in that case are for services alleged to have been performed under two contracts: one contract called for engineering and consulting services to develop a hydroelectric power plant on Iran's Karun River; this was with Mahab Consulting Engineers (though performed for the benefit of the Khuzestan Water & Power Authority and Iran's Ministry of Energy and Natural Resources). The other contract involved miscellaneous services under a "General Services Agreement" between Mahab and "Parsmain," an "Iranian" corporation partially owned by Main. Main's complaint contains a further allegation that the Central Bank of Iran, now Bank Markazi Iran, wrongfully failed to transmit a payment order of $378,000 authorized by Mahab. Damages totalling $3,256,787.26 are claimed.
 
 I.
 
 2
 The above suit was preceded by dramatic events. On November 4, 1979, American hostages were seized at the United States Embassy in Teheran. That hostile and unprecedented act precipitated a crisis in relations between Iran and the United States. On November 14, 1979, in response to the taking of hostages, President Carter declared a national emergency[1] and ordered blocked "all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States ...." Exec. Order No. 12170, 44 Fed.Reg. 65729. The President further authorized the Secretary of the Treasury to employ all powers granted to the President under the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., to carry out the blocking order. Pursuant to this authorization, the Treasury Department's Office of Foreign Assets Control (OFAC) promulgated regulations, effective November 14, 1979, prohibiting, absent a license or authorization, injunctions, attachments, judgments, or other relief, against property in which Iran or its entities had an interest. 31 C.F.R. §§ 535.201, 535.203(e), 44 Fed.Reg. 65956.
 
 
 3
 Main moved to sue the Iranian defendants a few days after the President and OFAC had acted. On November 19, 1979, it sought authority from OFAC to institute suit against the Iranian defendants, and, in conjunction therewith, to obtain injunctive relief and attachments against Iranian assets.[2] On November 20, 1979, an OFAC official informed Main's representatives over the telephone, and on November 21, 1979 Main received written confirmation, that it would be given a "special license" to "initiate and prosecute judicial proceedings" and to obtain preliminary relief against Iranian property; the license specifically provided that Main was not authorized to proceed to judgment on its claims or to receive any payment from the blocked assets. (On November 23, 1979, regulations were promulgated authorizing suits against Iran and its governmental entities on terms similar to those specified in Main's license. 31 C.F.R. § 535.504, 44 Fed.Reg. 67617.) Effective November 19, 1979, all OFAC "rulings, licenses ... (and) authorizations" pertaining to Iranian assets were explicitly made revocable "at any time." 31 C.F.R. § 535.805, 44 Fed.Reg. 66834.
 
 
 4
 On November 20, 1979 the day Main commenced its action the district court approved ex parte attachments on trustee process and issued a temporary restraining order enjoining the Iranian defendants from disposing of any of their assets located in the United States. On December 12, 1979, following a hearing, the district court entered a preliminary injunction to the same effect as its earlier TRO.[3] Defendants appealed the order granting the preliminary injunction, and this court heard oral argument on October 8, 1980. Further proceedings on the appeal were stayed, however, pending the outcome of ongoing negotiations for the release of the American hostages.[4]
 
 
 5
 On January 19, 1981, Iran released the hostages pursuant to an agreement with the United States, embodied in two Declarations of the Government of the Democratic and Popular Republic of Algeria.[5] The agreement states that it is "the purpose of both parties ... to terminate all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration." In furtherance of this goal, the agreement calls for the establishment of an Iran-United States Claims Tribunal (Tribunal), which will, with certain exceptions, arbitrate any such claims not settled within six months of the date of agreement; awards of the Tribunal will be "final and binding" and "enforceable ... in the courts of any nation in accordance with its laws." The United States is obligated "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran and its state enterprises, to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration." The United States must also "act to bring about the transfer" by July 19, 1981 of all Iranian assets held in "U. S. banking institutions in the United States." One billion dollars of these assets will go directly to a security account which will be used to fund awards of the Tribunal; Iran has agreed to maintain a minimum balance of $500 million in this account until all such awards are satisfied.
 
 
 6
 On January 19, 1981, President Carter issued a series of executive orders implementing the terms of the agreement with Iran. Exec.Order Nos. 12276-12285, 46 Fed.Reg. 7913-7932. In pertinent part, these orders revoked all licenses permitting persons to exercise "any right, power or privilege" with regard to Iranian funds, securities or deposits, "nullified" all non-Iranian interests in such assets acquired subsequent to the November 14, 1979 blocking order, and required those holding blocked Iranian assets to transfer them to the Federal Reserve Bank of New York, "to be held or transferred as directed by the Secretary of the Treasury."[6] See esp. Exec.Order No. 12279, 46 Fed.Reg. 7919. On February 24, 1981, President Reagan "ratified" the January 19 orders; he also ordered "suspended" all "claims which may be presented to the (Tribunal)" and provided that they "shall have no legal effect in any action now pending in any court of the United States." Exec.Order No. 12294, 46 Fed.Reg.14111.
 
 
 7
 On February 4, 1981, Main commenced an action in the District Court for the District of Massachusetts against the United States, seeking a declaration that the executive agreement with Iran, and the implementing executive orders and Treasury Department regulations, were in excess of the President's constitutional and statutory authority; in the alternative, Main sought a declaration that the agreement effected a "taking" of Main's "property" for a public use without just compensation, in violation of the fifth amendment. Chas. T. Main International, Inc. v. United States (Main v. United States), 509 F.Supp. 1162. On March 17, 1981, following a hearing, the district court granted the government's motion to dismiss the complaint in that case, holding that "the actions of Presidents Carter and Reagan have a legal basis in the provisions of Article II of the Constitution ... as well as in the powers granted to them by the provisions of the International Emergency Economic Powers Act."
 
 
 8
 On February 23, 1981, we remanded to the district court the appeal in Main v. KWPA, for reconsideration of the grant of preliminary relief in light of the executive agreement and orders. On April 7, 1981, relying on its decision in Main v. United States, the district court dissolved the preliminary injunction and vacated the ex parte attachments. The appeals from the orders in Main v. KWPA, and from the dismissal of the complaint in Main v. United States, are consolidated.[7]
 
 II.
 
 9
 The primary issue before us is one of presidential authority. As this nation's leader and as the head of one of the three coordinate branches of the federal government, the President holds substantial powers, both express and implied, under the Constitution. These powers may be supplemented, in certain areas, by delegations of authority from Congress. Justice Jackson described the reach of presidential power, and its interaction with that of the legislative branch, in his concurring opinion in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635-38, 72 S.Ct. 863, 870-71, 96 L.Ed. 1153 (1952):
 
 
 10
 1. When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate. In these circumstances, and in these only, may he be said (for what it may be worth) to personify the federal sovereignty. If his act is held unconstitutional under these circumstances, it usually means that the Federal Government as an undivided whole lacks power ....
 
 
 11
 2. When the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain. Therefore, congressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility. In this area, any actual test of power is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law.
 
 
 12
 3. When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive presidential control in such a case only by disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system.
 
 
 13
 Footnotes omitted.
 
 
 14
 Through the executive agreement with Iran, and through the implementing executive orders, the President has taken certain actions affecting Main's claims against Iran and its instrumentalities. First, he has purported to "nullify" Main's attachments and preliminary injunction against Iranian assets, and has prohibited Main from acquiring any further "right, power, or privilege" with regard to these assets. Second, he has ordered the transfer of Iranian assets to the Federal Reserve Bank, in preparation for their eventual transfer out of the United States. Finally, he has purported to "suspend" Main's "claim" against Iran and its governmental entities, at least pending a determination of the Tribunal's "jurisdiction" over the claim; if the Tribunal asserts jurisdiction, the suspension will, by virtue of the agreement, become a "termination" of the claim upon a decision by the Tribunal on the merits.
 
 
 15
 While each of these presidential actions is an integral part of a single agreement between the United States and Iran, there are salient differences between the first two and the third as regards the President's authority to undertake them. We thus analyze separately, first, the nullification of attachments and transfer of Iranian assets out of the United States and, second, the suspension of litigation currently pending before the courts of the United States.
 
 
 16
 A. Nullification of Attachments and Transfer of Assets
 
 
 17
 The International Emergency Economic Powers Act (IEEPA) enables the President, in times of declared national emergency, to:
 
 
 18
 (A) investigate, regulate, or prohibit
 
 
 19
 (i) any transactions in foreign exchange,
 
 
 20
 (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof,
 
 
 21
 (iii) the importing or exporting of currency or securities; and
 
 
 22
 (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;
 
 
 23
 by any person, or with respect to any property, subject to the jurisdiction of the United States.
 
 
 24
 50 U.S.C. § 1702(a)(1). The President relied on his IEEPA powers in November 1979, when he "blocked" all Iranian assets in this country, and again in January 1981, when he "nullified" interests acquired in blocked property, and ordered that property's transfer. The President's actions, in this regard, are in keeping with the language of IEEPA: initially he "prevent(ed) and prohibit(ed)" "transfers" of Iranian assets; later he "direct(ed) and compel(led)" the "transfer" and "withdrawal" of the assets, "nullify(ing)" certain "rights" and "privileges" acquired in them.
 
 
 25
 Main argues that IEEPA does not supply the President with power to override judicial remedies, such as attachments and injunctions, or to extinguish "interests" in foreign assets held by United States citizens. But we can find no such limitation in IEEPA's terms. The language of IEEPA is sweeping and unqualified. It provides broadly that the President may void or nullify the "exercising (by any person of) any right, power or privilege with respect to ... any property in which any foreign country has any interest ...." 50 U.S.C. § 1702(a)(1)(B) (emphasis added).
 
 
 26
 To be sure, it could be argued, by implication, that in enacting IEEPA Congress did not intend to authorize the President to wipe out liens on Iranian assets predating the President's invocation of his IEEPA powers. The language of section 1702(a)(1) is drawn directly from section 5(b) of the Trading with the Enemy Act (TWEA), which elsewhere provided U.S. citizens with mechanisms for recapturing the value of their interests in enemy property subject to presidential control, see, e. g., TWEA §§ 7(a) & 9(a). Here, however, there is no issue of presidential power to nullify judicially created interests in the property retroactively. By the time Main acted, the assets were within the President's control, under the umbrella of his IEEPA powers. Once the blocking order was in place, we do not believe that Main could obtain such an interest in the blocked assets as would later hamper the President in disposing of them. Main, in fact, proceeded against the "blocked" Iranian assets only under the provisional Treasury Department license which it had obtained.[8] By the terms of the license and by regulation, Main was prohibited from obtaining a final judgment against the assets or in any other manner levying on the assets to satisfy its claim. In the circumstances, we think Main could acquire no greater "property interest" in the blocked funds through "judicial remedies" or otherwise than its conditional license and the regulations allowed.
 
 
 27
 A presidential blocking order virtually identical to this was held impervious to judicial attachment in Orvis v. Brownell, 345 U.S. 183, 73 S.Ct. 596, 97 L.Ed. 938 (1953). In Orvis, United States litigants had obtained an attachment against property belonging to Japanese nationals, which was subject to a presidential blocking order entered pursuant to section 5(b) of the TWEA. The Alien Property Custodian (under the President's direction) had subsequently "vested" the property against which the attachment was entered, and had refused the litigants a license to use vested funds in satisfaction of their judgment against the Japanese nationals. The Supreme Court had already held, in Zittman v. McGrath, 341 U.S. 446, 71 S.Ct. 832, 95 L.Ed. 1096 (1951), that even with the blocking order in effect, litigants were entitled to obtain prejudgment attachments against "enemy" property.[9] Nevertheless, in Orvis the Court held such attachments ineffectual as against the Custodian's (and, by clear implication, the President's) power to transfer, vest, and dispose of the assets in the manner he saw fit. Although section 9(a) of the TWEA expressly provided "non-enemies" with a claim against the Custodian to recover any "interest, right, or title" in enemy property, the Court held that an attachment entered after a blocking order created no such "right" or "interest":(T)he general assent by the Government to state attachment procedures which we recited in the Zittman opinion did not extend so far as to recognize them as effecting a transfer. To so interpret it would ignore the express conditions on which the consent was extended. Realistically, these reservations deprive the assent of much substance; but that should have been apparent on its face to those who chose to litigate.
 
 
 28
 Id., at 187, 73 S.Ct. at 598.
 
 
 29
 The clear import of Orvis is that Main's injunction and attachments, obtained pursuant to a conditional Treasury Department license subsequent to the President's "freeze" of Iranian assets by blocking order, do not constrain the President in exercising his express powers under IEEPA to nullify non-Iranian interests in the assets and transfer them out of the country. Similar to Orvis, "the question is not whether a lien, concededly valid because obtained prior to the freezing order, may be 'annulled' by the (President), but rather whether the freezing order prevented the subsequent acquisition, by attachment, of such a property interest as the (President) would have to recognize ...." Id., at 188, 73 S.Ct. at 598. As in Orvis, the answer is in the affirmative.
 
 
 30
 We see no distinction between Orvis and the present case in the fact that IEEPA was enacted (in 1977) to, in certain respects, limit the President's former peace-time powers under the TWEA. While some such limitations were effected by IEEPA's enactment,[10] 50 U.S.C. § 1702(a)(1), on which the President relies, is virtually identical to section 5(b)(1) of the TWEA, with the exception that the President may no longer direct the "vesting" of foreign property. The President, however, has not purported to cause Iranian assets to "vest," but has simply ordered their "transfer" without effecting any change in title or ownership. Nor has the President "seized" the assets, as he would have been authorized to do under section 7(c) of the TWEA.[11]
 
 
 31
 Since Congress has authorized the President to block Iranian assets, nullify attachments of such assets obtained after the blocking order took effect, and transfer the assets out of the United States, the President lacked authority for these actions only if "the Federal Government as an undivided whole lacks (such) power ...." Youngstown, supra, 343 U.S. at 636-37, 72 S.Ct. at 870-71. Quite plainly, the federal government's powers do encompass control over foreign assets used in international commerce. See, e. g., Orvis v. Brownell, supra, 345 U.S. at 188, 73 S.Ct. at 598; Propper v. Clark, 337 U.S. 472, 482-86, 69 S.Ct. 1333, 1339-41, 93 L.Ed. 1480 (1949); see also Part III, infra (President may settle claims). Equally plainly, the compensation clause of the fifth amendment of the Constitution does not constrain the President in nullifying Main's attachments. Main's argument based on the compensation clause is undercut by the fact that its "interest" in Iranian assets was ab initio subordinate to the President's IEEPA powers.[12] See supra. Since Main's "property interest" in the Iranian assets was defined and delimited by IEEPA's terms, it could not have been "taken" by presidential action effected pursuant to the statute.
 
 
 32
 We therefore hold that the President had authority to order the transfer of blocked Iranian assets without regard to attachments or other judicial orders against the assets obtained subsequent to the November 14, 1979 blocking order.
 
 B. Suspension of Claims
 
 33
 The President's order suspending claims stands on a different footing. While it is not impossible to read IEEPA itself as providing authority for the President to suspend or terminate claims against a foreign sovereign, the statutory meaning in this regard is scarcely clear, and there is no precedent for such a reading.[13] Though we read IEEPA as giving some support to the President's order, see note 13, supra, we cannot say that it provides sufficient authority. We therefore approach the President's order in terms of whether he had inherent power under the Constitution to take such action. We hold that he did.
 
 
 34
 We are met at the outset with differing characterizations by the parties of what the President is attempting to do. Main contends that the President is attempting to regulate federal court "jurisdiction." If so, the validity of his actions would be in great doubt, since the power to define the jurisdiction of the lower federal courts is committed to Congress. U.S.Const., Art. I, § 8, cl. 9; Art. III, §§ 1 & 2, cl. 2. Moreover, in 1976 Congress enacted the Foreign Sovereign Immunities Act (FSIA), providing that "the district courts shall have original jurisdiction of any nonjury civil action against a foreign state ... as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under (28 U.S.C. §§ 1605-07) or under any applicable international agreement." 28 U.S.C. § 1330(a).[14]
 
 
 35
 The United States, on the other hand, maintains that the President has not attempted to divest the federal courts of "jurisdiction" over claims against Iran, but has simply exercised his constitutionally based power to "settle" the claims of U.S. nationals against a foreign state in the course of negotiating an end to an international crisis. The mandated settlement, in this instance, requires U.S. claimants to divert their claims to an international arbitration tribunal, with provision for a $1 billion fund from which to pay the Tribunal's awards, and for enforcement of awards in any country in accordance with its laws. Since the claims are thus "settled," they can no longer have any "legal effect" in the United States courts. Cf. Exec.Order No. 12294, 46 Fed.Reg. 14111.
 
 
 36
 The terms of the agreement with Iran, and of the executive orders themselves, may to some extent belie the United States' characterization of the President's actions as reflecting only a settlement of claims. The Declarations obligate the United States "to terminate all legal proceedings in United States courts" based on claims against Iran, and "to prohibit all further litigation based on such claims." Moreover, Exec.Order No. 12294, 46 Fed.Reg. 14111, purports, of its own force, to "suspend" "all claims for equitable or other judicial relief ... in any action now pending in any court of the United States," insofar as such claims may be presented to the Tribunal.[15] Nevertheless, if the President is in fact empowered to effect a binding settlement of the claims of United States nationals against Iran, it matters little, in practical terms, whether he has improperly attempted to go further. A binding settlement would compel dismissal of Main's action, not for lack of "jurisdiction," but for "failure to state a claim." Thus, rather than undertake a discussion of the President's ability, in general, to enter orders that might have an impact on the scope or exercise of federal court jurisdiction, we think it more appropriate to begin with an inquiry into the President's asserted international claims settlement power.
 
 
 37
 International agreements settling claims by nationals of one state against the government of another "are established international practice reflecting traditional international theory." L. Henkin, Foreign Affairs and the Constitution 262 (1972). In numerous instances, dating back to the earliest days of this country's history,[16] the President, often acting without the advice or consent of the Senate, has agreed to extinguish claims of United States nationals against foreign governments, in return for lump sum payments or the establishment of arbitration procedures. For recent examples see Agreement Between the Government of the United States and the Government of the People's Republic of China Concerning the Settlement of Claims, --- U.S.T. ---, T.I.A.S. 9306 (May 11, 1979); Agreement Between the Government of the United States and the Government of the Arab Republic of Egypt Concerning Claims of Nationals of the United States, 27 U.S.T. 4214, T.I.A.S. 8446 (May 1, 1976); Agreement Between the Government of the United States and the Government of the Hungarian People's Republic Regarding the Settlement of Claims, 24 U.S.T. 522, T.I.A.S. 7569 (March 3, 1973). See also J. B. Moore, Treaties and Executive Agreements, Sept. 1905 Political Science Quarterly 385, reprinted at 62 Cong.Rec. 13063-68, esp. 13066 (Sept. 21, 1922) ("It would be a work of supererogation to attempt to cite all the cases in which the Executive of the United States has settled individual claims against foreign governments without reference to the Senate"; "(n)ot only is the power of the President to settle the claims of citizens of the United States against foreign governments firmly established but he has repeatedly employed arbitration for the purpose.").
 
 
 38
 To be sure, such settlements were often encouraged by the U.S. claimants themselves; a claimant's only hope of obtaining any payment at all might lie in having his government negotiate a diplomatic settlement with the foreign power. However, the President has "sometimes disposed of the claims of (U.S.) citizens without their consent, or even without consultation with them, usually without exclusive regard for their interests, as distinguished from those of the nation as a whole." L. Henkin, supra, at 263. See, e. g., Meade v. United States, 76 U.S. (9 Wall.) 691, 19 L.Ed. 687 (1869); Comegys v. Vasse, 26 U.S. (1 Pet.) 193, 7 L.Ed. 108 (1803); cf. United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). See also Gray v. United States, 21 Ct.Cl. 340 (1886) (detailing history of the "French Spoliation Claims"). Indeed, the current Restatement (Second) of the Foreign Relations Law of the United States § 213 (1965) lists as black letter law the proposition that
 
 
 39
 The President may waive or settle a claim against a foreign state based on the responsibility of the foreign state for an injury to a United States national, without the consent of such national.[17]
 
 
 40
 The Supreme Court has recognized this presidential settlement power as being incidental to the President's position as the nation's representative in the arena of international affairs, and in particular, as a power necessary to facilitate the resolution of crises in foreign relations. In United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), the Court upheld the President's authority to undertake the so-called Litvinov Assignment, which, as part of the normalization of relations between the United States and the Soviet Union, settled claims of U.S. nationals arising from Russia's expropriations of property.[18] The Court had already held, in United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), that it was within the President's exclusive competence to undertake negotiations leading to the normalization of relations between the two governments, and to officially recognize the Soviet government. Id., at 330-31, 57 S.Ct. 760-61. In Pink, the Court said:
 
 
 41
 The purpose of the discussions leading to the policy of recognition was to resolve "all questions outstanding" between the two nations.... Settlement of all American claims against Russia was one method of removing some of the prior objections to recognition based on the Soviet policy of nationalization.
 
 
 42
 Id., at 227, 62 S.Ct., at 564. It continued,
 
 
 43
 Power to remove such obstacles to full recognition as settlement of claims of our nationals ... certainly is a modest implied power of the President who is the "sole organ of the federal government in the field of international relations." United States v. Curtiss-Wright Corp., supra, (299 U.S.) page 320, (57 S.Ct. page 221, 81 L.Ed. 225). Effectiveness in handling the delicate problems of foreign relations requires no less. Unless such a power exists, the power of recognition might be thwarted or seriously diluted. No such obstacle can be placed in the way of rehabilitation of relations between this country and another nation, unless the historic conception of the powers and responsibilities of the President in the conduct of foreign affairs (see Moore, Treaties and Executive Agreements, 20 Pol.Sc.Q. 385, 403-417) is to be drastically revised. It was the judgment of the political department that full recognition of the Soviet Government required the settlement of all outstanding problems including the claims of our nationals. Recognition and the Litvinov Assignment were interdependent. We would usurp the executive function if we held that that decision was not final and conclusive in the courts.
 
 Id., at 229-30, 62 S.Ct., at 565-66.[19]
 
 44
 It is not difficult to understand why it has become generally accepted that the President possesses power, at least in times of crisis in our international relations, to settle the claims of United States nationals against a foreign government. The matter becomes particularly clear if, as Justice Jackson maintained in his Youngstown concurrence, "any actual test" of the President's constitutional powers, especially in the foreign relations field, "is likely to depend on the imperatives of events and contemporary imponderables rather than on abstract theories of law." 343 U.S. at 637, 72 S.Ct. at 871. This case well illustrates the imperative need to preserve a presidential flexibility sufficient to diffuse an international crisis, in order to prevent the crisis from escalating or even leading to war. As the Supreme Court has consistently recognized, it is the President who is charged with responsibility as the United States' representative and negotiator in the international arena. See, e. g., United States v. Belmont, supra, 301 U.S. 330-31, 57 S.Ct. 760-61, 81 L.Ed. 1134; United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-22, 57 S.Ct. 220-21, 81 L.Ed. 225 (1936). The authority to remove impediments to the peaceful resolution of international disputes is an authority necessary to meet the responsibilities of presidential office, and, in the words of the Supreme Court, a "modest implied" attribute of presidential power. See United States v. Pink, supra, 315 U.S. at 229, 62 S.Ct. at 565.[20]
 
 
 45
 We cannot agree with Main that the FSIA was meant to eradicate "executive branch flexibility in an international crisis." No such intention is to be gleaned from the language of the statute, or to be found in its legislative history. FSIA was directed toward a single topic sovereign immunity.[21] In principal part, FSIA simply codifies contemporary concepts concerning the scope of sovereign immunity, and entrusts to the courts the determination of immunity in individual cases. To be sure, one objective of FSIA an objective heartily endorsed by representatives of the executive branch[22] was to end the practice whereby the State Department was expected to file, on a case-by-case basis, "suggestions of immunity," to which the courts would normally defer. However, the fact that the State Department may no longer, in the normal course of events, dispose of commercial litigation against a foreign state by asserting that state's immunity from suit does not reflect adversely on the President's long-accepted power, in times of international emergency, to settle or provide substitute means for the resolution of the underlying claims. As the district court stated, in providing a workable federal forum for the adjudication of commercial litigation involving foreign entities, "Congress never intended to cripple the negotiating power of American Presidents."[23]
 
 
 46
 We recognize that there are few precedents which deal precisely with claims of U.S. citizens against foreign government corporations. But merely because the FSIA has eased the way to suing such entities, it does not follow that the President's settlement power in the interest of conducting the nation's foreign affairs has been declared off limits in such suits. We observe that many foreign states, both developed and less developed, conduct vast and critically important economic programs and projects through the device of government corporations. Suits against such entities in many instances have the same impact as suits against the states themselves; by the same token amicable settlement has the same beneficent impact on our nation's foreign affairs. We thus consider such suits to be closely akin to suits against foreign governments themselves, and view neither our holding nor our analysis as having any necessary implications for the broad class of suits against foreign individuals and private commercial entities discussed by the concurring opinion. In this case, both because of the nature of the foreign entities involved and the unique surrounding circumstances, the President's action stands poles apart from executive settlement of a claim against a purely commercial foreign entity affecting only the parties to the settlement.
 
 
 47
 We need not and do not hold that the executive possesses plenary power to settle claims, even as against foreign governmental entities. It may be that much of this area is within that "zone of twilight in which (the President) and Congress may have concurrent authority." Youngstown, supra, 343 U.S. at 637, 72 S.Ct. at 871. The sheer magnitude of such a power, considered against the background of the diversity and complexity of modern international trade, cautions against any broader construction of authority than is necessary. Here, however, the President has acted to resolve what was indisputably a major crisis in the foreign relations of this country. His settlement of the claims of Main and others was not an isolated event but a necessary incident to the resolution of a dispute between our nation and another. Whatever may be the reach of the executive power under circumstances that implicate less squarely the conduct of foreign relations, the executive power extends so far as to permit the accord reached here.
 
 
 48
 We hold, therefore, that the President had authority to settle Main's claims against the Iranian defendants, by providing for their submission to binding arbitration. This being the case, we need not decide whether the President went too far in purporting to "order" the "suspension" of litigation relating to the claims. The claims having been settled, they are no longer cognizable in the courts, except insofar as permitted by the settlement's terms.
 
 III.
 
 49
 Main argues that it is at least entitled to compensation from the United States as a result of the President's actions in settling the claims.[24] We think, however, this issue is neither properly presented nor ripe for review.
 
 
 50
 There may well be situations when the President's extinction or "settlement" of a claim against a foreign government, without the consent of the claimant, would constitute a "taking" of private property for a public "use." See U.S.Const., Amend. V. Here, of course, the President has not simply "extinguished" Main's claim, but has provided alternative means for its resolution and satisfaction. Thus, his actions could at very most constitute a "taking" of property only if the alternative method of satisfying the claim (i. e., submission to the Tribunal) is demonstrably and measurably inferior to the rights otherwise available to Main (i. e., the right to attempt to obtain an unsecured judgment in the federal court). Yet, at present, it would be impossible to say with assurance whether the President has substituted a "lesser" remedy for a "greater," or vice versa.
 
 
 51
 To be sure, arbitration before the Tribunal poses, from Main's perspective, certain obvious disadvantages. Main might fear that a panel composed partly of Iranians will approach Main's claims with less sympathy than might a United States district court. The Tribunal could become stalled in procedural wrangles. On the other hand, there may, in fact, be some advantages to the arbitration process. Iran will be unable to present sovereign immunity or act of state defenses, and thus, at the least, potentially troublesome pre-trial skirmishes will be avoided.[25] Main will also derive some protection from a $1 billion security account, although it maintains this security represents only a fraction of all claims and thus may be inadequate. The Declarations also provide that Tribunal awards will be enforceable in any country in accordance with its laws. Thus, even should the security account prove insufficient, the Tribunal award may nevertheless be more valuable, in terms of enforcement abroad, than an equivalent unsecured United States court judgment. And, of course, the amount the Tribunal will award Main on its claim is at present uncertain.
 
 
 52
 Not only is Main's claim for compensation, at this point, wholly speculative, it is (unless "not exceeding $10,000 in amount") made before the wrong tribunal. See 28 U.S.C. §§ 1346, 1491 & 2201. If and when Main can establish a "taking" for which compensation is due, its remedy will lie in the Court of Claims. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 125-36, 95 S.Ct. 335, 349-54, 42 L.Ed.2d 320 (1974); Hughes Aircraft Co. v. United States, 534 F.2d 889, 902-06 (Ct.Cl.1976) (28 U.S.C. § 1502 bars only claims involving "rights given or protected by a treaty," which derive their "life and existence" from a treaty stipulation); see also United States v. Weld, 127 U.S. 51, 56-57, 8 S.Ct. 1000, 1002-1003, 32 L.Ed. 62 (1888).
 
 IV.
 
 53
 For the reasons stated above, we affirm the dismissal of the complaint in Main v. United States. We also affirm the orders of the district court in Main v. KWPA dissolving the preliminary injunction and vacating the ex parte attachments. In those orders, the district court stated that it "no longer (had) jurisdiction over the controversy." We think the court was technically incorrect in so stating: while the claims have been "settled" leaving the district court without any matters to adjudicate, litigation might be recommenced in the future in narrow circumstances contemplated in the February 24, 1981 Executive Order. Moreover, the district court certainly has jurisdiction to remove any remaining vestiges of the attachments and preliminary injunction, and there may be other relief, ancillary to the settlement and consistent with this opinion, which it may grant. (For example, to the extent the district court has not, as the United States asserts, vacated all attachments entered in Main v. KWPA, it may and should do so upon a proper motion.) This constitutes the full extent of the matters before us on appeal. We note the request of the United States that we "direct a stay of litigation of Main's claims against Iran which may be presented to the Tribunal." No such matter is encompassed within the pending appeals. If appropriate, such a request should be directed to the district court, which, we are certain, will act upon it in a manner not inconsistent with this opinion.
 
 
 54
 So ordered.
 
 
 55
 BREYER, Circuit Judge (concurring).
 
 
 56
 I agree with the court's disposition of this case and with its opinion insofar as it concerns Iran's assets the main issue from both a practical commercial, and a foreign affairs, point of view. I find troubling, however, the court's opinion on a subsidiary point that the President has inherent Article II power to settle Main's claim against the Khuzestan Water & Power Authority over Main's objection. The "inherent power" question is more difficult than the court suggests and at the same time it is not necessary to the court's decision. Given the need for a speedy decision and the possibility of further review,[1] I shall state my reasons briefly.
 
 
 57
 It is unnecessary to reach the question of whether the President, on his own under Article II, could suspend and settle Main's suit because IEEPA gives him adequate Congressional authority to take this action. IEEPA specifically gives the President the power to "regulate, ... nullify, void, prevent or prohibit ... (the) exercising (of) any right, power, or privilege with respect to ... any property in which any foreign country or a national thereof has any interest; by any person, or with respect to any property, subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1)(B). A civil lawsuit is surely the "exercising" of a "right" with respect to "property". The Khuzestan Water & Power Authority is a "foreign ... national" which has an interest in property that will be affected by the lawsuit. Even if the Authority's property is not now in the United States, the suit is brought "by" a "person ... subject to the jurisdiction of the United States." Thus, whether or not one considers Main's claim itself "property" subject to IEEPA, the President has authority under IEEPA's language to "void" or to "prohibit" the exercise of his right to sue. And, the history of IEEPA, enacted in the context of a lengthy list of instances in which the President has settled suits against foreign nations, supports the notion that Congress gave the President its specific assent to suspend, to prohibit, or to void such suits against foreign nations or nationals, during an emergency, where he finds that such action is required. H.R.Rep.No.459, 95th Cong. 1st Sess. 11, 15 (1977). See also United States v. Yoshida International, Inc., 526 F.2d 560, 579 (C.C.P.A.1975). Thus, we are here dealing with an instance of the President's acting with the specific assent of Congress the first, not the second, category mentioned in Youngstown. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). As the court points out, the Executive's authority in such a case has its greatest Constitutional breadth and is more than adequate to take the actions at issue.
 
 
 58
 I am reluctant to go further and attempt to determine the scope of the President's inherent Article II power to settle suits against foreign nationals over the plaintiffs' objections because that question is less clear than the court suggests. The court lists numerous instances of claim settlements, but these almost exclusively involved claims by Americans against foreign governments. It is hardly surprising that the President could settle such a claim, for under traditional principles of international law an individual had no claim against a foreign country ; only a nation could assert a right against another nation. Ex Parte Peru, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943). And, our courts recognized this principle of international law by allowing foreign countries to assert a defense of sovereign immunity when sued by an American in a domestic court. Id. During this century, however, international law has changed, and governments acting in a commercial capacity now tend to be treated like private citizens before the courts. The United States first recognized this change in the Tate Letter. 26 Dept. State Bull. 984 (1952). Congress then specifically codified the change in the Foreign Sovereign Immunities Act (FSIA) which instructed the courts not to accept a defense of sovereign immunity when the foreign entity sued is commercial in nature thereby treating them, for this purpose, like private citizens. 28 U.S.C. §§ 1330, 1602 et seq. Thus, there is some reason to believe that an action such as this one a suit against the Khuzestan Water & Power Authority based upon a contract for engineering services is to be treated by the courts like other suits by Americans against foreign individuals.[2]
 
 
 59
 Once one sees the potential implications of the court's opinion upon claims against foreign individuals,[3] one becomes uncertain about the validity of its broad assertion of inherent Presidential power. As the court points out, the foreign affairs power implicit in Articles I and II of the Constitution gives broad authority to the government to settle such claims where necessary particularly if the Fifth Amendment's prohibition of taking private property for public use without "just compensation" is honored through the allowance of a later suit. See Regional Rail Reorganization Act Cases, 419 U.S. 102, 124-5, 95 S.Ct. 335, 349, 42 L.Ed.2d 320 (1974).[4] Yet, the FSIA, by removing sovereign immunity as to such claims, suggests that the government is not the President alone.[5] The President does not on his own, without Congressional approval, have the power to seize a domestic steel mill at a time of grave domestic crisis. Youngstown Sheet & Tube Co. v. Sawyer, supra. Does he nonetheless have the power to seize an American's claim against, say, a foreign steel mill, even in the face of Congressional silence or opposition? The answer to this question is not given in the precedents the court cites for they are cases decided prior to evolution of the restrictive view or involve claims against a foreign government rather than a private citizen or both. One suspects the answer to this question depends upon the nature of the emergency facing the President, whether Congress is actively opposed and whether compensation is granted. But there is no need now to say that the President has broad inherent authority to settle all such claims in peace or war. To do so, given the commercial interdependence of the modern world and the scope of America's commercial involvement in foreign commerce, is to find enormous inherent power in the President to regulate international commercial dealings. And, it is a power that may, as a practical matter, be exercised, not by the President himself, but by lesser officials in the Departments of State or Commerce.
 
 
 60
 Since this is not a case which requires a decision of such magnitude, I would not make it. Rather, it is a case in which the President and Congress are in agreement, in which the Congress has delegated to the President adequate legislative authority to take the steps he proposes. And, that delegation, together with the President's actions, is sufficient to justify the court's decision.
 
 
 
 [1]
 The President's declaration of national emergency was accompanied by a finding, as required by the International Emergency Economic Powers Act, 50 U.S.C. § 1701, that the situation in Iran constituted "an unusual and extraordinary threat to the national security, foreign policy and economy of the United States." See note 10, infra. There is no question that the events in question constituted such an emergency
 
 
 [2]
 Main sought a license to file (and has filed) two lawsuits the one in the United States District Court for the District of Massachusetts, and another in the United States District Court for the Southern District of New York making identical claims. In the application for a license, Main represented that it sought to recover a total amount of $2,878,787.20 (with interest and costs); the discrepancy between this figure and the $3,256,787.26 claimed in the Main v. KWPA complaint brought in the District of Massachusetts is presumably due to the fact that the $378,000 alleged owing from Bank Markazi would be offset against the amount alleged due from Mahab and the other Iranian defendants
 
 
 [3]
 The district court ordered that
 The defendants Khuzestan Water & Power Authority, Mahab Consulting Engineers, Central Bank of Iran and the Government of Iran, their agents, servants, employees, attorneys and any persons in concert with them or acting on their behalf, are hereby restrained and enjoined from selling, assigning, pledging, giving, delivering or in any way encumbering or disposing of any of their assets located in the United States pending the determination of this action or until further order of the Court, except that, if otherwise permitted by the Iranian Assets Control Regulations, 31 C.F.R. part 535, or by specific license pursuant thereto,
 (a) the Government of Iran may use its assets located in the United States for the sole and specific purpose of maintaining diplomatic or consular offices and missions and carrying out the general diplomatic or consular functions of such diplomatic or consular offices; and
 (b) agencies and instrumentalities of the Government of Iran that are located in the United States, other than the defendants named herein, may pay salaries and fees of personnel employed or retained in the United States in the ordinary course of business ....
 
 
 [4]
 By order of this court, dated October 30, 1980, proceedings on the appeal were stayed until December 15, 1980. On December 11, 1980, we extended the stay, and on February 23, 1981, we remanded the appeal to the district court. See infra
 
 
 [5]
 The negotiations which led to the agreement were authorized and supervised by the President, who, on January 19, 1981, issued a "Statement of Adherence" to the Declarations. The Declarations have never been ratified by the Senate, and are properly viewed as embodying an "executive agreement" or "international compact," rather than a "treaty." See United States v. Belmont, 301 U.S. 324, 330-31, 57 S.Ct. 758, 760-61, 81 L.Ed. 1134 (1937)
 
 
 [6]
 While the Secretary of the Treasury has ordered the transfer of Iranian assets to the Federal Reserve Bank, he has also provided that "the United States Government will not seek to impose civil or criminal sanctions on any party who does not make (such transfers)" until the President's authority to order the transfers "has been the subject of a definitive legal ruling." 46 Fed.Reg. 14335 (Feb. 26, 1981) (to be codified at 31 C.F.R. § 535.221(b))
 
 
 [7]
 In addition, we have retained appellate jurisdiction over the original appeal from the order granting preliminary relief (which would, at this point, appear to be moot)
 
 
 [8]
 We agree with the district court that purported informal representations by Treasury Department employees could not make the license irrevocable. Nor did the slight time lapse between issuance of the license and publication of the regulations providing for revocability have such an effect. Moreover, even had Main secured its attachments without obtaining a license, it could not, in any event, have acquired interests in the Iranian assets that would have prevented the President from exercising his IEEPA powers. See infra
 
 
 [9]
 At the time Zittman was decided, however, attachment was necessary as a means of obtaining jurisdiction over a claim against an enemy debtor. Thus, the attachments permitted in Zittman served a purpose other than as security, enabling claimants to obtain a judicial determination of the validity and amount of their claims against foreign nationals. The Foreign Sovereign Immunities Act now prohibits attachments against foreign states obtained for jurisdictional purposes. 28 U.S.C. §§ 1609 & 1610(d)(2)
 
 
 [10]
 Aside from withdrawing the power to order "vesting" of foreign assets, IEEPA further limits the President's emergency authority to situations where there is an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy or economy of the United States." 50 U.S.C. § 1701(a); S.Rep.No.95-466, 95th Cong., 1st Sess. 5 (1977), reprinted in (1977) U.S.Code Cong. & Ad.News 4540, 4543. See note 1, supra
 
 
 [11]
 Section 7(c) of the TWEA draws a clear distinction between the President's power to order foreign assets "conveyed, transferred, assigned, (and) delivered" and the Alien Property Custodian's power to "seize" the assets
 
 
 [12]
 We should point out, in addition, that there is a substantial unresolved question whether Main was ever entitled to obtain attachments and injunctions against the assets of the Iranian defendants. In enacting the Foreign Sovereign Immunities Act, Congress placed severe restrictions on litigants' ability to attach the assets of a foreign state or its instrumentalities. 28 U.S.C. §§ 1609-11. Such attachments were said to have been a source of "significant irritation" and "serious friction in United States' foreign relations." H.R.Rep.No.94-1487, 94th Cong., 2d Sess. 27 (1976), reprinted in (1976) U.S.Code Cong. & Ad.News 6604, 6626. Prejudgment attachments are authorized only against "(t)he property of a foreign state ... used for a commercial activity in the United States" and only when "the foreign state has explicitly waived its immunity from attachment prior to judgment ...." 28 U.S.C. § 1610(d). See also 28 U.S.C. § 1609 (rendering immunity from attachment "(s)ubject to existing-international agreements"). This at least suggests that it might be improper to enter an attachment which, like the preliminary injunction at issue here, purports to restrain the use of any and all property of a foreign state located in this country
 We realize that there is much to be said on both sides of the issue, and do not in any way purport to decide whether the attachments and preliminary injunction obtained by Main were prohibited by 28 U.S.C. §§ 1609-11. Still, in assessing what the President took away in exercising his powers under IEEPA, it is relevant to bear in mind that a right to attachment has been considered the exception, rather than the norm, in suits by United States nationals against a foreign government.
 
 
 [13]
 Our parsing of IEEPA's multiple powers indicates that the President is authorized to:
 investigate, regulate, direct and compel, nullify, void, prevent or prohibit,
 any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving
 any property in which any foreign country or national thereof has any interest;
 by any person, or with respect to any property, subject to the jurisdiction of the United States.
 50 U.S.C. § 1702(a)(1)(B).
 Our brother argues that if Main's claim is not itself "property" in which Iran has an "interest," subject to IEEPA, its lawsuit is the "exercising" of a "right" with respect to "property," and thus subject to presidential nullification. One might also argue that other combinations of IEEPA's shopping list of words cover this case, e. g., that the lawsuit is a step leading toward "acquisition ... of ... property (of Iran)," or that it is a "transaction involving ... property." The very breadth of the powers given the President under IEEPA, and the desirability of relying on statutory rather than constitutional authority, might tempt one to find an implied congressional grant of authority.
 Nevertheless we feel uneasy in resting on such a construction. To say that an unliquidated claim in personam for money damages is a "right" with respect to "property," or that it is "acquisition" of "property," or that it is a "transaction involving ... property" simply because it may someday be reduced to judgment and capable of execution is to render a technical word rich in ancient teaching amorphous and all inclusive.
 Further militating against such a reading is the fact that the "chief objects" of the TWEA, IEEPA's predecessor, were 1) the prevention of trade with the enemy in time of war, and 2) the "conserv(ation) and utiliz(ation) upon a basis of practical justice (of) enemy property found within the jurisdiction of the United States." H.R.Rep.No.85, 65th Cong., 1st Sess. 1 (1917). The Act sought to further the goal of conserving enemy property by bringing it "under the control of the Government, to be impounded or used, and to await such disposition at the close of the war as Congress may determine." Id., at 3. One contemplated "use" of such property was the satisfaction of claims of U.S. citizens. Id., at 4. Given such purposes, it would seem questionable that Congress intended claims by U.S. citizens against the enemy to be among the sorts of "enemy property" to be "impounded."
 While we therefore conclude that we cannot rest on any express or implied grant of power from Congress in IEEPA, we find no hint of congressional disapproval of the power to settle claims in these circumstances. Even if IEEPA does not confer such a power, it shows Congress' willingness to give the President wide discretion in dealing with issues affecting foreign assets during periods of international crisis. In addition, we are told that the President notified Congress of the agreement with Iran, as required by IEEPA, and that Congress has not registered opposition to any provision, including that purporting to suspend judicial claims and substitute arbitration.
 
 
 [14]
 As suggested in note 12, there are substantial questions, raised in the initial Main v. KWPA appeal and never resolved by this court, concerning the Iranian defendants' entitlement to immunity under the FSIA. Given our disposition of this appeal, resolution of these questions (which might require further factual development in the district court) is unnecessary; we will assume, for purposes of the present discussion, that jurisdiction was properly asserted under section 1330(a)
 
 
 [15]
 The Order attempts to define, with some particularity, the terms on which litigation may proceed. For example, claimants are permitted to commence an action in the courts "for the purpose of tolling the period of limitations" and are also entitled to assert "a counterclaim or set-off ... in any judicial proceeding pending or hereafter commenced by the Government of Iran." Moreover, "(n)othing in (the) Order shall require dismissal of any action for want of prosecution."
 
 
 [16]
 Some of the earliest settlements, such as that relating to the 1799 case of the Schooner "Wilmington Packet," 5 Miller, Treaties and Other International Acts of the United States of America 1079 (1934), involved claims of U.S. nationals stemming from the seizure of ships by foreign "privateers." Early examples of large-scale settlements of the claims of U.S. nationals against foreign governments include the 1800 and 1803 conventions between the United States and France (see 6 Moore's International Law Digest § 1056, at 1022-25 (1906)), the 1819 treaty between the United States and Spain, which included the ceding of Florida to the United States (see Comegys v. Vasse, 26 U.S. (1 Pet.) 193, 7 L.Ed. 108 (1828)), the 1868 convention between the United States and Mexico (see La Abra Silver Mining Co. v. United States, 175 U.S. 423, 20 S.Ct. 168, 44 L.Ed. 223 (1899)), and the 1871 agreement between the United States and Spain (see 2 Malloy, Treaties, Conventions, International Acts, Protocols and Agreements Between the United States and Other Powers 1661 (1910)). See also J. B. Moore, Treaties and Executive Agreements, Sept. 1905 Pol. Science Q. 385, reprinted at 62 Cong.Rec. 13063-68 (Sept. 21, 1922) (compiling major 19th century claims settlement agreements)
 
 
 [17]
 Congress has also, from time to time, expressed its recognition and acceptance of the practice of presidential claims settlement. See, e. g., 78 Cong.Rec. 460-68 (Jan. 11, 1934); 62 Cong.Rec. 13050-71 (Sept. 21, 1922)
 
 
 [18]
 The agreement, an overall settlement of claims as between the governments and nationals of the two states, assigned to the United States all amounts "admitted to be due or that may be found to be due" on claims of the U.S.S.R. against U.S. nationals, in return for the release of the U.S.S.R. from liability for the nationalization of property owned by U.S. citizens; funds collected by the United States under the assignment would then be used to satisfy the claims of its nationals. See United States v. Pink, supra, 315 U.S. at 212-13, 62 S.Ct. at 556-57; United States v. Belmont, 301 U.S. 324, 326-27, 57 S.Ct. 758, 758-59, 81 L.Ed. 1134 (1937)
 
 
 [19]
 It can be argued that the Litvinov Assignment was a "better deal," from the perspective of certain United States claimants, than is the settlement with Iran. Moreover, the only issue directly presented in Pink was whether the United States, as assignee, could recover the assets of a nationalized branch of a Russian corporation, in derogation of the rights of the corporation's foreign creditors an action which would obviously increase the funds available to satisfy the claims of U.S. citizens. Nonetheless, the rationale used by the Court in support of the President's settlement powers would seem applicable regardless of a reviewing court's opinion of the favorableness of the overall settlement. See also Part III, infra
 
 
 [20]
 Of course, neither the President nor Congress may exercise their powers so as to contravene the protections of the Bill of Rights, even when acting in the sphere of international relations. See Reid v. Covert, 354 U.S. 1, 15-19, 77 S.Ct. 1222, 1229-1231, 1 L.Ed.2d 1148 (1957). Main here contends that the President's actions amount to a "taking" without "just compensation," a contention we discuss briefly infra. This issue, however, is separate from the question whether the President, as opposed to Congress, had the authority to take the action that might amount to a "taking" of "property." Since we hold that the President did possess the authority to act as he did, if and to the extent he has effected a taking of private property for a public use, Main will have a claim against the United States for just compensation. See Part III infra; Regional Rail Reorganization Act Cases, 419 U.S. 102, 126-27 & n. 16, 95 S.Ct. 335, 349-50 & n. 16 , 42 L.Ed.2d 320 (1974); Yearsley v. Ross Construction Co., 309 U.S. 18, 20-22, 60 S.Ct. 413, 414-415, 84 L.Ed. 554 (1940). See also Gray v. United States, 21 Ct.Cl. 340, 392-93 (1886) (authority to extinguish claims against the government of France "too clear for discussion," although such action may give rise to right to compensation against United States)
 
 
 [21]
 For example, FSIA did not even purport to effect changes in the related "act of state" doctrine. See Hearings on H.R.11315 before House Comm. on Judiciary, Subcomm. on Admin.Law and Govt.Rels. at 34 (June 2, 1976) (statement of Monroe Leigh, State Dept. Legal Adviser: "In this particular bill, we have been careful ... to make it clear that the bill applies only to the doctrine of sovereign immunity and does not extend to the act of state doctrine")
 
 
 [22]
 See, e. g., Hearings, note 21 supra, at 33-35 (statement of Monroe Leigh that bill will relieve State Dept. of burden); see also H.R.Rep.No.94-1487, 94th Cong., 2d Sess., at 7, reprinted in (1976) U.S.Code Cong. & Ad.News 6604, 6606 (under FSIA, "Department of State would be freed from pressures from foreign governments to recognize their immunity from suit and from any adverse consequences resulting from an unwillingness of the Department to support that immunity"; judicial determinations of immunity "would conform to the practice in virtually every other country")
 
 
 [23]
 Contrary to Main's suggestion, a general grant of "jurisdiction" over a class of claims does not necessarily reflect an ironclad congressional policy against actions that might "interfere" with the exercise of the jurisdiction. See United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801), where in spite of "jurisdiction" and, indeed, a lower court judgment against seized French property, the Supreme Court gave effect to a treaty calling for return of the property to France. Moreover, Congress's enactment of IEEPA, one year after enactment of the FSIA, demonstrates that it was not adverse to actions, taken in time of national emergency, that might undercut the viability of jurisdiction and remedies authorized by the FSIA
 
 
 [24]
 We have already said that no right to compensation would arise from the President's nullification of Main's attachments under his IEEPA powers. See Part II A, supra. Thus, any claim for compensation would be based solely on the mandated settlement of Main's ongoing (and, minus the attachments, unsecured) court claims against Iran and its entities
 
 
 [25]
 Of course, if the Iranian defendants would be entitled to immunity from suit in United States courts, see note 14, supra, Main will be better off with recourse to the Tribunal
 
 
 [1]
 This case was argued on May 8. The parties have indicated an intention to seek Supreme Court review prior to the July 19, 1981 deadline for transfer of all Iranian assets held in the United States
 
 
 [2]
 In addition, the Treaty of Amity between the United States and Iran provides:
 No enterprise of either High Contracting Party, including corporations, associations, and government agencies and instrumentalities, which is publicly owned or controlled shall, if it engages in commercial, industrial, shipping or other business activities within the territories of the other High Contracting Party, claim or enjoy, either for itself or for its property, immunity therein from taxation, suit, execution of judgment or other liability to which privately owned and controlled enterprises are subject therein.
 Treaty of Amity, Economic Relations and Consular Rights between the United States and Iran. Art, XI, P 4, 8 U.S.T. 899, 909, (entered into force June 16, 1957). While it is disputed whether Khuzestan Water & Power Authority is engaged in a commercial enterprise within the United States, within the meaning of the Treaty, the court does not suggest that it would reach a different result were it dealing with a claim against an Iranian entity that is more obviously engaged in a commercial enterprise within the United States.
 
 
 [3]
 One might argue that a commercial branch of a foreign government should be treated like a private individual for purposes of amenability to suit, but like a foreign government for purposes of an "inherent" Presidential claims' settlement power. Yet, the FSIA suggests Congressional hostility to this additional legal complexity. The practicalities of foreign affairs have not been shown to require any such distinction, particularly since Congress, in IEEPA, has specifically authorized the President to take the action at issue here
 
 
 [4]
 The "right to compensation" here would, in my view, arise out of the President's assertion of an IEEPA power, not the treaty or executive agreement with Iran or Algeria. Thus, jurisdiction is likely to lie in the Court of Claims. See Hughes Aircraft Co. v. United States, 534 F.2d 889, 902-06 (Ct.Cl.1976). Of course, for reasons that the court points out, the value of what was taken may be very small
 
 
 [5]
 The FSIA was designed in part to take from the Executive Branch the power to determine in each individual case, on the basis of foreign policy considerations, whether the courts should dismiss a claim on grounds of sovereign immunity. H.R.Rep.No.1487, 94th Cong., 2nd Sess. 6-7, 12 (1976). And, once sovereign immunity disappears in a particular case at least one part of the rationale underlying the President's historical authority to settle the case over objection also disappears. Whether the other part of that rationale practical consideration of foreign policy is sufficient to support an inherent Presidential power is the difficult question that here need not be decided